# EXHIBIT D

Confidential Pursuant to Protective Order Entered in 13 C 5697

INDEPENDENT POLICE REVIEW AUTHORITY    LOG #1059373         1

1
2
3
4
5
6
7
8
9      STATEMENT OF OFFICER KEVIN FRY
10     CONDUCTED BY INVESTIGATOR GRACE WILSON
11     on the 15th of July 2014 at 1545 hours
12              at the offices of
13     Independent Police Review Authority
14
15
16
17
18
19
20
21
22
23
24

VICTORIA COURT REPORTING SERVICE, INC.
(312) 443-1025

#81

Chatman v. City of Chicago, et al., 13 C 5697
FCRL 001258

1       INVESTIGATOR WILSON: This is the digitally
2  recorded statement of Officer Kevin Fry, Star #15329
3  relative Log #1059373 regarding an incident that
4  occurred on 7 January 2013 at the location of 2005
5  East 75th Street.
6       This statement is being taken at the Independent
7  Police Review Authority's office at the location of
8  10, oh, I'm sorry, 1615 West Chicago Avenue.  I am
9  Investigator Grace L. Wilson, Badge #110, that's
10 Grace, G-r-a-c-e Wilson, W-i-l-s-o-n.  Today's date is
11 the 15th of July 2014 and the approximate time is 1545
12 hours.

                        EXAMINATION
13
14 BY INVESTIGATOR WILSON:
15      Q    Will everyone present please provide their
16 names and spell them for the record?
17      A    Officer Kevin Fry, F-r-y.
18      MR. REBHOLZ: Attorney Thomas Rebholz, T-h-o-m-a-
19 s R-e-b-h-o-l-z.
20 BY INVESTIGATOR WILSON:
21      Q    And Officer Fry, would you spell your name
22 for the record?
23      A    K-e-v-i-n F-r-y.
24      Q    And Officer Fry, did you receive your

Confidential Pursuant to Protective Order Entered in 13 C 5697

1    notification of charges, administrative rights, waiver
2    or request to secure counsel forms and are you
3    prepared to provide an audio statement at this time?
4        A    Yes I am.
5        Q    Officer Fry, please state your full name,
6    star number, employee number and unit of assignment.
7        A    This statement is not being given
8    voluntarily but under duress. I am only giving this
9    statement at this time because I know that I will lose
10   my job if I refuse the direct order given to me.
11       Officer Kevin Fry, K-e-v-i-n F-r-y, Star #15329,
12   employee ▮▮▮▮ currently assigned to the 4th
13   District, Chicago police.
14       Q    And Officer Fry, what is your current age
15   and date of birth?
16       A    I am ▮▮▮▮ years old, born on ▮▮▮▮
17   ▮▮▮▮
18       Q    And what is your date of employment
19   appointment to the Chicago Police Department?
20       A    29 September 2003.
21       Q    And how long have you been assigned to your
22   present unit?
23       A    Approximately three years.
24       Q    Are you accompanied by counsel of your

1  choosing and if so, please identify him for the
2  record.
3      A   Yes I am.
4      MR. REBHOLZ:  Attorney Thomas Rebholz.
5  BY INVESTIGATOR WILSON:
6      Q   Are you aware that this statement has the
7  standing of an official Chicago Police Department
8  report and that any intentional falsification of any
9  answer to any question would be in direct violation of
10 the Department's rules and regulations?
11     A   Yes.
12     Q   Do you understand that this is an official
13 police department report and that any deviation from
14 the truth could result in charges being placed against
15 you?
16     A   Yes.
17     Q   Given that, I would like to remind you that
18 failure to provide a complete and accurate statement
19 could result in a finding of a violation of Rule 14
20 and disciplinary action up to and including
21 separation.  Do you understand?
22     A   Yes.
23     Q   And Officer Fry, what was your duty status
24 on 7 January 2013 at approximately 1346 hours?

Confidential Pursuant to Protective Order Entered in 13 C 5697

Confidential Pursuant to Protective Order Entered in 13 C 5697

1   A   I was on duty.

2   Q   And who was your partner on the above day?

3   A   Lou (phonetic) Toth, T-o-t-h.

4   Q   Please state what occurred on the 7th of
5   January 2013 at approximately 1346 hours while in the
6   vicinity of 2005 East 75th Street.

7   A   Officer Toth and I were on patrol. We were
8   headed westbound on 75th Street, and observed a silver
9   Dodge Charger roll through a stop sign northbound on
10  Essex turning left, westbound onto 75th Street. I ran
11  the plate, which is attached to the car which was a
12  Wisconsin plate.

13      The plate came back clear to a gentleman out of
14  Milwaukee, Wisconsin. We then turned southbound onto
15  Crandon, and as Officer Toth and myself were
16  approaching 76th Street, a call came out of a battery
17  in progress at 76th and Essex.

18      Shortly after that, a second call came out of a
19  robbery in progress in the same vicinity and a third
20  call came out seconds later of a vehicular hijacking
21  from the same area. The description on the vehicular
22  hijacking, the vehicle was a silver Dodge Charger.

23      Officer Toth went over the air and asked the
24  dispatcher if the Dodge Charger had Wisconsin plates.

Confidential Pursuant to Protective Order Entered in 13 C 5697

1  She answered that yes it did. We then went westbound
2  on 76th Street, northbound on Luella and westbound on
3  75th Street and had the vehicle in view as it was
4  pulling up to 75th and Jeffrey.

5  The vehicle was stopped at a red light at 75th and
6  Jeffrey. Officer Toth pulled our vehicle to the right
7  in the bus lane slightly in front of the Dodge
8  Charger. Both Officer Toth and I exited the squad car
9  with our weapons drawn.

10 Officer Toth announced several times police, let
11 me see your hands, to the driver and only occupant of
12 the vehicle. At which time the driver fled from the
13 driver's side of the vehicle. He fled southbound
14 across 75th Street between two parked cars.

15 Officer Toth was following behind him. I had
16 come around the rear of the Dodge Charger and the
17 driver of the vehicle was then headed westbound on 75th
18 Street. I was running on a diagonal across 75th Street
19 in a southwest direction.

20 At which point, when the driver of the vehicle
21 reached the corner, he began to turn to his right
22 slightly. I observed in his right hand a dark gray or
23 black object which I believed to be a handgun. In
24 fear of Officer Toth's life and my own life, I fired

Chatman v. City of Chicago, et al., 13 C 5697
FCRL 001263

Confidential Pursuant to Protective
Order Entered in 13 C 5697

1  four shots at the driver of the vehicle.

2  He continued running southbound out of my line of
3  vision. I sliced the pie around the corner, at which
4  point I observed Officer Toth was placing him in
5  custody. I then stopped the Dodge Charger which was
6  rolling through the intersection and flagged down a
7  passing fire truck to administer emergency aid.

8  Q  How far away were you from the person that
9  was in the Dodge now known to be Mr. Cedrick
10 (phonetic) Chapman (phonetic)?

11 A  At what point ma'am?

12 Q  When he exited the vehicle, how far away
13 were you from him?

14 A  I was coming around, I exited the passenger
15 side of our vehicle and I was coming around the back
16 of his vehicle. So as he exited the vehicle, my
17 estimation would be; I give you an estimate of twelve
18 to eighteen feet away from him.

19 Q  When you saw him exit the vehicle, did you
20 observe anything in his hand?

21 A  I wasn't able to see his hands.

22 Q  Following this police shooting, was a weapon
23 recovered of any kind?

24 A  No.

1       Q    At what point did you feel Mr. Chapman posed
2  a threat?
3       A    When he slowed down at the corner and began
4  to turn to his right. I was able to see a dark object
5  in his hand which I believed to be a handgun.
6       Q    Besides you and Officer Toth, were you aware
7  of any other citizens or Department members in the
8  immediate area?
9       A    It was so long ago, I don't recall.
10      Q    What was Chapman's initial action demeanor?
11      MR. REBHOLZ: Could you pause for a second ma'am?
12      (Whereby the recording was paused)
13 BY INVESTIGATOR WILSON:
14      Q    Okay, Officer, I'm going to repeat that
15 question. What was Mr. Chapman's initial demeanor?
16      A    Mr. Chapman's demeanor was such that he was
17 disobeying several police orders from Officer Toth and
18 fled from us.
19      Q    What was his approximate height?
20      A    I don't recall.
21      Q    Did you use any additional tactics to
22 protect yourself or your partner, other than already
23 described?
24      A    No ma'am.

Confidential Pursuant to Protective Order Entered in 13 C 5697

Confidential Pursuant to Protective
Order Entered in 13 C 5697

1  Q    Approximately where were you standing or
2  sitting when you first saw Mr. Chapman?
3  A    I got a brief glimpse of him in the vehicle,
4  but not a very good one. I was sitting in the squad
5  car at that point and I got a better look at him after
6  I had exited my squad car and he was fleeing on foot.
7  Q    I'm showing you Attachment, I'm showing you
8  Attachment 25, do you recognize the person in the
9  photograph?
10 A    Yes.
11 Q    And who would that be?
12 A    That's Mr. Chapman.
13 Q    Did you move while shooting, or stand still?
14 A    I stood still.
15 Q    What was your posture when you fired?
16 A    Standing.
17 Q    At what point did you realize Mr. Chapman
18 was shot and why?
19 A    I didn't realize he was shot until I had
20 rounded the corner and he was laying in the street.
21 Q    Did you pause while firing?
22 A    No.
23 Q    Was there any object between you and Mr.
24 Chapman when you fired?

Confidential Pursuant to Protective
Order Entered in 13 C 5697

1  A   No.

2  Q   Prior to firing, did you see Mr. Chapman's
3  full body, say from his head to his feet, or was there
4  a portion of his body that you couldn't see?

5  A   No, I could see his whole body.

6  Q   What is your height and weight?

7  A   I'm five eight, about two hundred pounds.

8  Q   Have you ever had previous contact with the
9  citizen involved in this shooting?

10 A   No.

11 Q   Please describe the clothing that you were
12 wearing.

13 A   I was in citizen dress. I was wearing cargo
14 pants of some sort. I had on an outer vest cover
15 which had my star, with the star number embroidered on
16 it, as well as my name and a police logo on the back.
17 I had a full duty belt on, as well as other, police
18 radio and other items on my vest.

19 Q   How familiar were you with the area where
20 the incident occurred?

21 A   Fairly familiar

22 Q   What kind of squad car were you assigned to
23 that day?

24 A   It was an unmarked Crown Vic.

Confidential Pursuant to Protective Order Entered in 13 C 5697

1  Q   What were the lighting conditions?
2  A   It was daytime, I don't remember if it was
3  cloudy or sunny.
4  Q   Prior to the incident, when was the last
5  time that you had an eye exam?
6  A   I don't recall.
7  Q   Do you wear corrective lenses and, if so,
8  were you wearing them on the date of the incident?
9  A   Yes.
10 Q   Are you nearsighted or farsighted?
11 A   Nearsighted.
12 Q   How far away from the subject was Officer
13 Toth when you fired?
14 A   I would estimate eight to twelve feet
15 approximately.
16 Q   And, how far away were you from the subject
17 when you fired?
18 A   Once again, I would have to estimate,
19 approximately fifteen to twenty-five feet.
20 Q   Did Mr. Chapman extend his arm toward you or
21 Officer Toth?
22 A   No.
23 Q   How was the crime scene preserved?
24 A   Officers arrived on the scene and taped off

Confidential Pursuant to Protective
Order Entered in 13 C 5697

1  the scene securing the, you know, the area.
2      Q    How long did it take for a supervisor to
3  arrive?
4      A    I don't recall exactly. My estimate would
5  be within minutes.
6      Q    Did any of your equipment malfunction during
7  the incident?
8      A    No.
9      Q    Have you ever worked with Officer Toth prior
10 to the incident?
11     A    Officer Toth and I are on the same team,
12 although I believe, to the best of my recollection,
13 that's the first time we worked together as partners.
14     Q    Did anyone yell "gun"?
15     A    I don't remember.
16     Q    Could you see what was in Mr. Chapman's
17 hand?
18     A    I saw a dark gray or black object that I
19 believed to be a handgun.
20     Q    How far to the right did Mr. Chapman turn,
21 meaning did he turn his, just his head, his body,
22 both?
23         MR. REBHOLZ:  Just, you know, to be descriptive,
24 was it just upper torso, did he stop and turn his feet

Confidential Pursuant to Protective
Order Entered in 13 C 5697

1  as well, was it just what, you know, just try to
2  describe it.
3       OFFICER FRY:  It was more of an upper torso turn
4  from what I remember.
5  BY INVESTIGATOR WILSON:
6       Q    You stated that you saw an object in his
7  hand, what hand was he holding the object in?
8       A    His right hand.
9       Q    At some point you saw Mr. Chapman's body
10 lying on the ground, that is correct?
11      A    That is correct.
12      Q    And, did you observe any object near Mr.
13 Chapman or on the sidewalk, if so, what?
14      A    There was a black cell phone case laying on
15 the sidewalk near Mr. Chapman.
16      Q    A cell phone case meaning a, like a leather
17 case?
18      A    I believe it was a box.
19      Q    And could you tell me the dimensions of the
20 box?
21      A    I would really have to estimate.  I would
22 say approximately two inches high by approximately
23 four to six inches long by approximately three to five
24 inches wide.

1     Q    Now I'm going to ask you your allegation.
2  And the allegation is that on the 7th of January 2013
3  at approximately 1346 hours, while in the vicinity of
4  2005 East 75th Street, did you disobey the Chicago
5  Police Department's use of deadly force policy by
6  using deadly force, meaning firing your gun, against
7  Mr. Chapman?
8     A    No I did not.
9     Q    Is this a true and accurate account of what
10 occurred?
11    A    Yes it is.
12    INVESTIGATOR WILSON:  This concludes the
13 digitally recorded interview of Officer Kevin Fry and
14 the time is 4:06, 1606 hours.
15                (STATEMENT ENDED)

Confidential Pursuant to Protective Order Entered in 13 C 5697

Confidential Pursuant to Protective
Order Entered in 13 C 5697

```
 1    STATE OF ILLINOIS )
 2                     ) SS
 3    COUNTY OF C O O K )
 4
 5         I, VICTORIA E. ROCK, Notary Public, do hereby
 6    certify that I caused this audio recording to be
 7    transcribed.
 8         I further certify that the foregoing is a true
 9    and correct transcription to the best of my ability;
10    and further, that I am not counsel for nor in any
11    way interested in the outcome thereof.
12
13         IN TESTIMONY WHEREOF, I have hereunto set my
14    hand this 30th day of July, 2014.
15
16
17                    _____
18                         VICTORIA E. ROCK
19                         CSR #084-001929
20
21
22
23
24
```