IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION

| | |
|---|---|
| LINDA CHATMAN, Administrator of the Estate of Cedrick Chatman, deceased,<br><br>      Plaintiff,<br>  v.<br><br>CITY OF CHICAGO, a municipal corporation; LOU TOTH, KEVIN FRY, and other not presently known to plaintiff,<br><br>      Defendants. | Case No. 13 C 5697<br><br>Judge Robert W. Gettleman |

## MEMORANDUM OPINION AND ORDER

Plaintiff Linda Chatman, Administrator of the Estate of her deceased son, Cedrick Chatman ("Chatman"), has brought a two count amended complaint against the City of Chicago and Chicago Police Department ("CPD") Officers Lou Toth and Kevin Fry. Count I, brought against Toth and Fry, alleges that the officers violated Chatman's rights under the Fourth Amendment to be free from the excessive use of force, when Fry shot and killed Chatman while the officers were attempting to arrest him for carjacking. Count II is a state law wrongful death claim brought against all three defendants. Toth has moved for summary judgment on both counts. For the reasons described below, that motion is granted.

## **FACTS**[1]

On January 7, 2013, Fry and Toth were patrolling the Fourth District in Chicago in an unmarked Crown Victoria squad car. Both officers were in plain clothes but wore police vests that clearly indicated that they were CPD officers. While driving in the vicinity of 75th Street

---

[1]The facts are taken from the parties' L.R. 56 Statements as well as surveillance video from three cameras that has been provided to the court.

and Essex Avenue, they saw a silver Dodge Charger with Wisconsin license plates roll through the stop sign on Essex and turn westbound onto 75th Street. They "ran" the license plate through their computer, which indicated that the car was clear and registered to an individual in Milwaukee. The Charger continued westbound on 75th Street while the officers turned south onto Crandon Avenue.

At that time the officers heard a dispatch about a battery in progress at 76th Street and Essex, just a few blocks east. The dispatch was then updated to a robbery in progress, and then a carjacking of a silver Charger. Toth radioed dispatch asking if the silver Charger was actually the car carjacked. The dispatcher responded that it was and that it had a Wisconsin license plate.

The officers immediately realized that they had just seen the car, so they turned west on 76th Street and proceeded to Luella. They turned north on Luella to 75th Street and turned west on 75th Street in an effort to catch up with the silver Charger. They found the Charger stopped at the light at the intersection of 75th Street and Jeffrey. Officer Toth pulled the squad car next to and slightly ahead of the Charger on the passenger side. The Charger was stopped behind another car, and there was a car behind it. The two officers then exited their car with guns drawn. Toth exited first and went to the front of the Charger, identifying himself as police and telling the driver to raise his hands. Fry exited the squad car immediately after Toth, and went to the back of the Charger on the driver's side.

The driver of the Charger, who turned out to be Chatman, raised one hand in response to Toth's directive, but appeared to reach down and grab something with his other hand. Chatman then opened the car door and fled southeast across 75th Street. He ran between two parked cars and then turned westward on the 75th Street sidewalk. Toth gave chase and was initially only a

2

few steps behind, but as they continued west toward the corner of 75th Street and Jeffrey, Chatman increased his lead slightly.

Meanwhile, Fry was moving westward down the middle of 75th Street toward Jeffrey. As Chatman was nearing the corner of 75th Street and Jeffrey, Fry claims to have seen Chatman holding a dark object in his right hand extended in front of him. According to Fry, Chatman turned his upper torso slightly to his right. Fry, claiming to believe that the dark object was a hand gun, fired four shots at Chatman. Toth heard the shots, but did not know who shot, and slowed slightly.

Chatman continued running and turned south onto Jeffrey. He apparently veered off the sidewalk into the street near the curb. Toth continued to chase, and when he turned onto Jeffrey he found Chatman laying on the street. As he approached, he claims Chatman stated, "I give up. I'm shot." Toth then pulled Chatman's arms behind his back and placed him in handcuffs.

Fry, after shooting, proceeded to the corner and saw that Toth had Chatman under control. Fry then ran back to the intersection because the Charger, which had been left in gear, was rolling west down 75th Street. He placed the car in park and then the officers flagged down a passing fire truck to give aid to Chatman.

Toth testified that while chasing Chatman, he never saw Chatman's hands or a gun. He did see Chatman turning slightly to his right, just before reaching the corner, and just before Fry opened fire. He found a black cell phone box by Chatman after the fire truck arrived.

## **DISCUSSION**

Toth has moved for summary judgment on both counts. A movant is entitled to summary judgment when the moving papers and affidavits show that "there is no genuine dispute as to any

3

material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a); Celotex Corp. v. Catrett, 477 U.S. 317, 322 (1986). Once the moving party has met its burden, the nonmoving party must go beyond the pleadings and set forth specific facts showing there is a genuine issue for trial. See Fed. R. Civ. P. 56(c); Becker v. Tenenbaum-Hill Assoc., Inc., 914 F.2d 107, 110 (7th Cir. 1990). The court considers the record as a whole and generally draws all reasonable inferences in the light most favorable to the nonmoving party. Green v. Carlson, 826 F.2d 647, 651 (7th Cir. 1987). When, however, as in the instant case, the evidence includes a video tape of the relevant events, the court should not adopt the nonmoving party's version of the events when that version is blatantly contradicted by the video tape. Scott v. Harris, 550 U.S. 372, 379-80 (2007). In the instant case, the parties have submitted three video tapes of the incident; one from a CPD "POD cam" located on a traffic light; one from a nearby convenience store; and one from South Shore High School.[2] Although none of the three show the entire incident separately, it is undisputed that when viewed together they give an accurate overall account of the incident in general and the position of the three participants when the shooting occurred. Thus, the court relies primarily on the video to decide the instant motion. Williams v. Brooks, ___ F.3d ___, 2016 WL 51409, *4 (7th Cir. Jan. 5, 2016).

**Excessive Force**

Plaintiff claims that both Toth and Fry used excessive force in arresting Chatman. "An officer who has the right to arrest an individual also has the right to use some degree of physical

---

[2]As discussed more fully below, the videos, which were covered by a protective order issued by the magistrate judge, were not submitted by any party in connection with Toth's (or the City's pending) summary judgment motion. The court ordered the public disclosure of the videos on January 14, 2016.

4

force or threat of force to effectuate the arrest." Williams, 2016 WL 51409 at *6. "That right is circumscribed by the Fourth Amendment's reasonableness standard." Id. This inquiry requires an examination of the "totality of the circumstances to determine whether the intrusion on a citizen's Fourth Amendment interests was justified by the countervailing government[al] interests at stake." Jacobs v. City of Chicago, 2015 F.3d 758, 773 (7th Cir. 2000). In evaluating the reasonableness of the officer's action, the court considers "the severity of the crime at issue, whether the suspect poses an immediate threat to the safety of the officers or others, and whether he is actively resisting arrest or attempting to evade arrest by flight." Graham v. Connor, 490 U.S. 386, 396 (1989). Courts must "remain cognizant of the fact that police officers are often forced to make split-second judgments – in circumstances that are tense, uncertain and rapidly evolving – about the amount of force that is necessary in a particular situation." Williams, 2016 WL 51409 at *6 (quoting Abbott v. Sangamon County, 705 F.3d 706, 724 (7th Cir. 2014)).

In addition, the instant case involves an allegation (at least against Fry) of the unreasonable use of deadly force. The Supreme Court has stated that it is unreasonable for an officer to "seize and unarmed, non-dangerous suspect by shooting him dead." Tennessee v. Garner, 471 U.S. 1, 11 (1985). Where, however, "the officer has probable cause to believe that the suspect poses a threat of serious physical harm, either to the officers or to others, it is not unconstitutionally unreasonable to prevent escape by using deadly force." Id.

Recognizing that Toth did not discharge his weapon or otherwise use deadly force, plaintiff raises two rather weak arguments to suggest that Toth's actions were objectively unreasonable. First, relying on Baird v. Renbarger, 576 F.3d 340, 344-45 (7th Cir. 2009), and

5

McDonald v. Haskins, 966 F.2d 292, 294 (7th Cir. 1992), plaintiff argues that it was unreasonable for Toth to have drawn his weapon when approaching the silver Charger.

Neither case supports plaintiff's position. In Baird, the Seventh Circuit held that it was unreasonable for a police officer to "wield a 9-millimeter submachine gun" to detain people during the execution of a search warrant based on the crime of altering a vehicle identification number. The crime did not include violence, there was no suggestion that anyone at the search location was armed or dangerous, and no one at the site presented any resistence. Under these circumstances, the court held that a reasonable jury could find that the use of the submachine gun was objectively unreasonable. Baird, 576 F.3d at 345. In McDonald, the court held that holding a gun against a 9-year-old child's head during a search and threatening to pull the trigger was "objectively unreasonable." 966 F.2d at 294-95.

Baird and McDonald, and other similar cases such as Jacobs, stand for the simple proposition that pointing a gun when an individual presents no danger is unreasonable and violates the Fourth Amendment. In the instant case, it undisputed that Toth and Fry had received information that the silver Charger had been carjacked after a fight. Carjacking itself is a violent crime, and given the circumstances they had every reason to believe the occupant was dangerous. There was nothing objectively unreasonable about drawing their weapons and ordering Chatman to raise his hands.

Next, plaintiff argues that Toth is guilty of using excessive force by failing to stop Fry's use of deadly force. A police officer may be liable for failing to prevent another officer from inflicting excessive force "if that officer had reason to know: (1) that excessive force was being used, (2) that a citizen ha[d] been unjustifiably arrested, or (3) any constitutional violation has

6

been committed by a law enforcement official; and the officer had a realistic opportunity to intervene to prevent the harm from occurring." Yang v. Hardin, 37 F.3d 282, 285 (7th Cir. 1994) (emphasis in original). A realistic opportunity to intervene may exist when the officer could have called for help, or cautioned the officer using the excessive force to stop. Abdullahi v. City of Madison, 423 F.3d 763, 774 (7th Cir. 2005).

In the instant case, the video tapes refute any suggestion that Toth had any opportunity to prevent Fry from discharging his weapon. The whole incident, from the point that Chatman fled the Charger to the time Toth began to place him in handcuffs, took approximately 13 seconds. Fry appears to discharge his weapon 6 seconds after Chatman began to run. The videos clearly show Toth chasing Chatman onto the 75th Street sidewalk, initially right on his heels and then falling slightly behind. Fry, on the other hand, remained in the middle of 75th Street, behind and to the right of both Toth and Chatman. Toth could not see Fry, and Fry gave no indication that he was going to shoot. Toth simply did not have time either to call for help or to stop Fry from firing. No reasonable jury could find otherwise. See e.g., King v. City of Indianapolis, 969 F. Supp.2d 1085, 1095 (S.D. Ind. 2013); Thomas v. City of Fort Wayne, 2008 WL 282348 at *8 (N.D. Ind. Jan. 31, 2008).

Consequently, for the reasons described above, the court grants summary judgment to Toth on plaintiff's excessive force claim (Count I).[3]

---

[3] Plaintiff's brief contains one line at the beginning of the argument section suggesting that Toth committed excessive force when he handcuffed Chatman after the shooting. Plaintiff has presented no support for this argument, and it is never mentioned again. The court considers the argument waived, but in any event under the circumstances of the instant case no reasonable jury could find that the simple act of handcuffing, without more, constitutes excessive force.

**Wrongful Death**

Count II is a claim under Illinois state law for wrongful death. Because Toth did not shoot Chatman, plaintiff seeks to hold Toth liable for Fry's tortious conduct. Under Illinois law, a person can be held jointly and severally liable for another's tortious conduct if he: (a) does a tortious act in concert with the other or pursuant to a common design with him; or (b) knows that the other's conduct constitutes a breach of duty and gives substantial assistance or encouragement to the other so to conduct himself; or (c) gives substantial assistance to the other in accomplishing a tortious result and his own conduct, separately considered, constitutes a breach of duty to the third person. Woods v. Cole, 181 Ill.2d 512, 517 (1998) (citing Restatement (2d) of Torts, § 876, at 315 (1979)).

None of these factors apply to Officer Toth. He did not commit a tortious act. Nor did he know that Fry was going to shoot or give Fry substantial assistance. As Toth points out, the Restatement Comments, Illustration No. 3 provides:

> 3. A is drunk and disorderly on the public street. B, C and D, who are all police officers attempt to arrest A for the misdemeanor committed in their presence. A resists arrests. B and C take hold of A, using no more force than is reasonable under the circumstances. A breaks away and attempts to escape. D draws a pistol and shoots A in the back. B and C are not liable to A for the shooting.

This illustration is directly on point. Under the facts of the instant case, Toth cannot be held jointly and severally liable for Fry's actions. Consequently, Toth's motion for summary judgment on Count II is granted.

Finally, the court is compelled to express its concern about the manner in which counsel have represented their clients in connection with Toth's motion for summary judgment. First, all three defendants (the two CPD officers and the City of Chicago) are represented by Assistant

8

Corporation Counsels. Although in many excessive force cases the interests of police officers are identical to each other and to those of the City, in the instant case there appears to be a conflict that generated extensive litigation concerning the public release of the videos of the incident. In particular, the court sees no reason why, in representing Officer Toth, counsel did not submit the video that confirmed his deposition testimony that exonerates him from the failure to intervene claim. That same video evidence, however, arguably supports plaintiff's claim against Officer Fry. The only reason the court can speculate as to why counsel did not submit the video in defense of Officer Toth is the City's then-current policy of keeping videos of police shootings out of the public eye, a policy which the City now claims is "in transition" and moving towards a policy of "transparen[cy]" in light of recent public disclosures of videos of other police shootings.[4] (See Doc. 176.) In any event, there seems to have been an unexplained conflict of interest in the representation of both Toth and Fry by the same Assistant Corporation Counsels – a conflict which has been resolved by the granting of Toth's motion for summary judgment.

## CONCLUSION

For the reasons described above, defendant Toth's motion for summary judgment (Doc. 102) is granted.

**ENTER:** **January 20, 2016**

_Robert W. Gettleman_

---

[4]Indeed, the court cannot explain why plaintiff did not submit the videos, even in camera due to the protective order, in support of their response to the current motions for summary judgment by Toth and the City, since they claim that the videos support their theory of the facts.

9

**Robert W. Gettleman**
**United States District Judge**