Exhibit 11

# SUMMARY REPORT
## CHICAGO POLICE DEPARTMENT

| LOG NO | TYPE | DATE OF REPORT |
|---|---|---|
| 1059373 | CR, U | 07-OCT-2014 |

**TO:** CHIEF ADMINISTRATOR, INDEPENDENT POLICE REVIEW AUTHORITY

| FROM - INVESTIGATOR'S NAME | RANK | STAR NO | EMPLOYEE NO | UNIT ASSIGNED | UNIT DETAILED |
|---|---|---|---|---|---|
| WILSON, GRACE | 9181 | | 12892 | 113 | |

REFERENCE NOS.(LIST ALL RELATED C.L., C.B., I.R., INVENTORY NOS., ETC., PERTINENT OF THIS INVESTIGATION)

| INCIDENT ADDRESS: 2005 E. 75TH ST, CHICAGO, IL 60649 | DATE / TIME: 07-JAN-2013 13:01 | BEAT: 414 |
|---|---|---|

## ACCUSED

| NAME | RANK | STAR NO | EMP NO | UNIT ASSIGNED | UNIT DETAILED | SEX/RACE | DOB | APPOINTED DATE | ON DUTY? | SWORN? |
|---|---|---|---|---|---|---|---|---|---|---|
| FRY, KEVIN S | 9161 | 15329 | Redacted | 004 | | M / WHI | Redacted | 29-SEP-2003 | YES | YES |

## REPORTING PARTY

| NAME | ADDRESS* | CITY STATE | TELEPHONE | SEX / RACE | DOB / AGE |
|---|---|---|---|---|---|
| GULLIFORD, WAYNE | RANK: 9785, STAR NO: 683, EMP NO: Redacted | | | M / WHI | Redacted 55 |

## VICTIMS

| NAME | ADDRESS* | CITY STATE | TELEPHONE | SEX / RACE | DOB / AGE |
|---|---|---|---|---|---|
| Redacted | Redacted | | | M / BLK | Redacted / 19 |

## WITNESSES

| NAME | ADDRESS* | CITY STATE | TELEPHONE | SEX / RACE | DOB / AGE |
|---|---|---|---|---|---|
| TOTH, LOU | RANK: 9161, STAR NO: 14630, EMP NO: Redacted | | | M / WHI | Redacted 38 |

* IF CPD MEMBER, LIST RANK, STAR, EMPLOYEE NOS. IN ADDRESS, PAX/BELL IN TELEPHONE BOX.

## ALLEGATIONS

** SEE LAST PAGE FOR INSTRUCTIONS FOR STATING ALLEGATIONS, AND COMPLETING THE REMAINDER OF THE SUMMARY REPORT.

SEE PAGE TWO.

*1ST DRAFT*

**ALLEGATIONS:**

On 7 January 2013, at 15:10 hours, Independent Police Review Authority (IPRA) Investigator James Lukas documented that Deputy Chief Wayne Gulliford, Star #683, Unit 142/212, reported that Police Officers Lou Toth and Kevin Fry stopped a car driven by a subject near 75th and Jeffery because the car had been involved in a vehicular hijacking. The subject fled from the car and ran south on Jeffery. Both officers chased the subject on foot. The subject pulled out a dark object and pointed it at the officers. Officer Fry, fearing for his life and that of his partner, fired approximately four rounds at the subject, striking him. The dark object was determined to be a black iPhone box, possible proceeds from the vehicle hijacking.

IPRA Investigator Grace L. Wilson alleges that on 7 January 2013, at approximately 1346 hours, while in the vicinity of 2005 East 75th Street, Police Officer Kevin Fry, Star #15329, Unit 004:

1.	disobeyed the Chicago Police Department's use of deadly force policy by using excessive and unjustified deadly force against **Redacted** by shooting him.[1]

---

[1] Numerous documents incorrectly identify the deceased subject as **Redacted**

**PRELIMINARY INFORMATION:**

On 7 January 2013, at 1418 hours, the Independent Police Review Authority (IPRA) was notified of a police-involved shooting that occurred near 7501 South Jeffery, in the 4th District. The information below was provided by Street Deputy Wayne Gulliford, #683, during a walkthrough of the shooting scene, and is a summary based on multiple levels of hearsay and is not verbatim.

Deputy Gulliford related that at approximately 1340 hours, Involved Officer Kevin Fry, #15329, and Witness Officer Lou Toth, #14630, were assigned to Beat 463E, working in plainclothes. Officer Toth was driving and Officer Fry was seated in the front passenger's seat. The two officers observed a gray Dodge Charger with Wisconsin plates driving erratically westbound on East 75th Street. They ran a check of the license plate on their PDT, which initially came back "clear". The officers then heard an Office of Emergency Management and Communications (OEMC) call of a battery-in-progress near 76th and Essex. The officers began to drive towards the location of the battery in progress. OEMC then updated the call over the air and stated that the battery-in-progress was now a robbery-in-progress and a vehicular hijacking. The OEMC dispatcher gave a description of the vehicle that was hijacked. Officers Fry and Toth realized the gray Dodge Charger that they had just observed was the vehicle that had been hijacked. The officers drove back to 75th Street in search of the vehicle. The officers located the Dodge Charger stopped in traffic at the intersection of 75th Street and South Jeffery Avenue.

Officer Toth drove the squad car into the bus lane and stopped alongside the passenger's side of Charger. Officer Toth exited the driver's side of the squad car and crossed in front of the Charger. Officer Toth ordered the driver, now known as Redacted Redacted out of the vehicle. Mr. Redacted did not initially exit the vehicle and repeatedly reached inside of the vehicle. Mr. Redacted exited the Dodge Charger, leaving it in drive, and began to run towards the south side of 75th Street. Mr. Redacted then ran westbound toward Jeffery Avenue. Officer Toth followed the same route Mr. Redacted ran, while Officer Fry ran diagonally toward the southeast corner of 75th Street and Jeffery Avenue in order to cut Mr. Redacted off. Mr. Redacted approached the corner of 75th Street and Jeffery Avenue and continued to look back at the officers as he ran. Mr. Redacted then pointed a dark object back towards the officers as he continued to run. Officer Fry, fearing for his life and Officer Toth's life, fired four rounds at Mr. Redacted striking him. Mr. Redacted ran a short distance onto south Jeffery Avenue just south of the intersection and fell to the ground, dropping the dark object. A Chicago Fire truck was passing the location just after the shooting and stopped to render aide. Mr. Redacted was then transported to Northwestern Hospital where he died from his injuries.

During the walk through, the dark object alleged to have been pointed at Officer Fry was determined to be a black iPhone box; possibly proceeds from the vehicular hijacking. The box was located near where Mr. Redacted was taken into custody. (Attachment 4).

**INVESTIGATION:**

The **Original Case Incident Reports** (RD #HW108051 and RD #HW114498) and the **Case Supplementary Report** (RD #HW114498) documented the initial investigation of the incident by Area South Detectives. Ms. **Redacted** was interviewed by detectives and stated that she was in her vehicle, facing north on Jeffery, preparing to turn east onto 75th Street, when she heard gunshots, and observed Mr. **Redacted** run into her vehicle, causing him to spin around, while knocking off her passenger side mirror.

Ms. **Redacted** was interviewed by detectives and related that she was seated in Mr. **Redacted** Dodge Charger as he was waiting to meet **Redacted** at **Redacted** "**Redacted**" and two other black males entered his rear seat. When **Redacted** arrived and began to argue with Mr. **Redacted** about a cell phone, the three males in the back seat demanded money from Mr. **Redacted** and grabbed, punched, and robbed Ms. **Redacted** of her jacket, shoes, cell phone, and 40 dollars, before she was able to flee. One of the males drove away in Mr. **Redacted** vehicle.

Mr. **Redacted** was interviewed by detectives and related that he was involved in a scam with Ms. **Redacted** where he sold her a cell phone, which she returned to him and reported it lost or stolen to receive a replacement. Mr. **Redacted** would resale the phone and pay Ms. **Redacted** a small fee. On the day of the incident, Mr. **Redacted** went to meet Ms. **Redacted** at her residence, **Redacted** to sell a cell phone. Ms. **Redacted** brother, **Redacted** (now know to be **Redacted**, her boyfriend, and an unknown black male (now known to be Mr. **Redacted** entered the rear seat of Mr. **Redacted** car. Ms. **Redacted** arrived at Mr. **Redacted** car, complaining that her cell phone had been cancelled. **Redacted** grabbed Mr. **Redacted** Ms. **Redacted** boyfriend struck Mr. **Redacted** in the face, and the men removed his shoes and 400 dollars from his pocket. When Mr. **Redacted** was able to get out of his car, he was attacked by other bystanders. Mr. **Redacted** drove away in Mr. **Redacted** car.

Officer Toth was interviewed by detectives and stated that Mr. **Redacted** exited the Charger and ran southeast bound toward two parked cars while always looking back. Officer Toth followed Mr. **Redacted** between the two parked cars. When Mr. **Redacted** reached the sidewalk, he turned westbound with Officer Toth still in pursuit. Mr. **Redacted** began to turn to his right, as to face Officer Toth. At that time, Officer Toth heard several gunshots and immediately slowed his pursuit. When Officer Toth reached the corner, he observed Mr. **Redacted** lying in the street. Officer Toth heard Mr. **Redacted** say, "I give up. I'm shot."

Officer Fry was interviewed by detectives and stated that Mr. **Redacted** exited the Charger and ran southbound between the middle of two parked cars with Officer Toth in pursuit. Mr. **Redacted** reached the sidewalk and ran westbound toward Jeffery. Officer Fry ran westbound in the street at which time he observed Mr. **Redacted** turn to the right, in the direction of him (Officer Fry) and Officer Toth. Mr. **Redacted** had a dark gray/black object in his hand. Officer Fry believed the object was a handgun and he was in fear for Officer Toth's life. Officer Fry fired his weapon four times at Mr. **Redacted** striking him.

Mr. Redacted was interviewed by detectives and stated that he, Redacted Redacted and Redacted entered the back seat of Mr. Redacted car as his sister, Redacted argued with Mr. Redacted about Ms. Redacted telephone. When Mr. Redacted lied to Ms. Redacted about her telephone, Mr. Redacted pulled Mr. Redacted partially into the back seat and took a cell phone from the front seat console. Other people from the neighborhood pulled Mr. Redacted from his car and beat him. Mr. Redacted drove away from the scene in Mr. Redacted car.

Mr. Redacted gave a statement to detectives denying any knowledge of the incident. He later asked for a lawyer.

Ms. Redacted was interviewed by detectives and stated that Mr. Redacted deals in cell phones and gives a referral fee to anyone who finds him customers. Ms. Redacted called Mr. Redacted and told him that she had two customers for him, Mr. Redacted and Mr. Redacted. When Mr. Redacted arrived, Mr. Redacted, Mr. Redacted and Mr. Redacted rushed from the apartment and entered the back seat of Mr. Redacted car. Ms. Redacted went to the car and told Mr. Redacted to give her referral fee to Mr. Redacted. As soon as she said that, Mr. Redacted grabbed Mr. Redacted from behind and people, including those hanging around the building at Redacted began to beat Mr. Redacted Mr. Redacted drove away in his car.

Mr. Redacted and Mr. Redacted were charged with Felony Murder, two counts of Robbery, and Vehicular Hijacking. Mr. Redacted case was closed as "Homicide – Justifiable Homicide. (Attachments 13, 74, 75).

A **Detective Case Supplementary** Report (HW108051) documented that on 7 January 2013, two lineups were conducted at Area South, which resulted in Ms. Redacted Redacted identifying Mr. Redacted as one of the offenders who robbed her of her jacket, and Mr. Redacted identifying Mr. Redacted and Mr. Redacted Redacted as two of the subjects who robbed him of $400.00 and a 4G cellular phone. (Attachment 14).

**Officer Fry** submitted a **Tactical Response Report** (TRR) which documented that Mr. Redacted did not follow verbal directions and fled. Officer Fry responded with his presence, verbal commands, and his firearm. He fired four shots at a distance of between 10 and 15 feet. Officer Fry's additional information was "Subject [ Redacted began to turn towards R/O and his partner, P.O. Toth, while holding an object believed to be a firearm. R/O, in fear of P.O. Toth's life, discharged firearm at subject." (Attachment 15).

**Officer Fry's Officer's Battery Report** (OBR) documents that he and his partner were battered while pursuing/arresting an offender for 720 ILCS 5.0/18-3-A, Vehicular Hijacking. The subject was armed with a small black object. The narrative of the report documents that "Subject began to turn towards R/O and his partner, P.O. Toth, while holding an object believed to be a firearm. R/O, in fear of P.O. Toth's life, discharged firearm at subject." (Attachment 16).

**Officer Toth** submitted a **TRR** which documented that Mr. Redacted did not follow verbal directions, fled, and pointed an object at him. Officer Toth responded with his presence, verbal commands. (Attachment 17).

**Officer Toth's OBR** documents that he and his partner were battered while pursuing/arresting an offender for 720 ILCS 5.0/18-3-A, Vehicular Hijacking. The subject pointed a small black object at him. (Attachment 18).

The **Crime Scene Processing Report** (Report #216071) documented that three (3) Hornady 45auto +P cartridge cases were recovered from 2002 E. 75th Street and one (1) Hornady 45auto +P cartridge case was recovered from 2000 E. 75th Street. A copper metal fragment was recovered from the sidewalk at 1958 E. 75th Street. A black Apple iPhone 5 box (containing a new 16GB Apple iPhone 5 Model A1428) and a white cellular phone power adapter were recovered form the sidewalk at 7501 S. Jeffery Boulevard. (Attachment 21).

The **Forensic Investigator's plat** listed various measurements of the crime scene. 75th Street is 42' wide. The south sidewalk of 75th Street is 12' wide. The distance between the two cars that Mr. Redacted ran between was 1'8" wide. The location of three cartridge cases were measured at 21' north of the south curb of 75th Street and 26' east of the east curb of Jeffery; 23'6" north of the south curb of 75th Street and 25'6" east of the east curb of Jeffery; and 24' north of the south curb of 75th Street and 18'6" east of the east curb of Jeffery. A fourth cartridge case was 16' north of the south curb of 75th Street and 2'6" west of the east curb of Jeffery. (Attachment 83).

The **Illinois State Police; Forensic Science Center Laboratory Report** (Case #C13-002396) dated 17 January 2013, examined (Officer Fry's pistol) a Sig Sauer, model P220, 45 Auto caliber semiautomatic pistol, serial #G358342. It was found to be in firing condition. There were five (5) Hornady 45 Auto +P caliber unfired cartridges in the magazine. The four (4) recovered Hornady fired cartridges cases were identified as having been fired from the same weapon. The recovered fired 45 caliber bullet and 45 caliber bullet fragment could not be identified or eliminated as having been fired from the same weapon. On the same date, the latent fingerprints on the iPhone box were found to have been made by Mr. Redacted (Attachments 66 and 71).

The **eTrack inventory** item inquiry listed a Sig Sauer P-220 Exeter-NH .45 caliber semi-automatic pistol, four inch barrel, blue steel finish, an eight shot capacity magazine, Hornady 45 auto +P live cartridges. The weapon belongs to Officer Fry. (Attachment 26).

The relevant **crime scene photos** depict the side of the Health Care Center, 2011 E. 75th Street, and the north side of the South Shore Food Market, 7501 S. Jeffery Boulevard. The east end of the north side of the South Shore Food Market abuts the Health Care Center. The parked Buick LeSabre that Mr. Redacted ran past is opposite the side door of the South Shore Food Market. A utility junction box, a mail box, a newspaper box, and a light pole are located on the sidewalk, opposite the west end of the

South Shore Food Market. There is an apparent bullet strike mark at the lower west corner of the entrance to the South Shore Food Market. There is an apparent bullet strike mark on the brick wall under the canopy of the South Shore Food Market. There are three (3) cartridge cases east of the east crosswalk at the 75th and Jeffery intersection and north of the 75th Street center line. A fourth cartridge case was photographed on the west side of the east crosswalk, south of the 75th Street center line. A dark gray iPhone box and a white cellular phone vehicle power adapter were photographed on the sidewalk at 7501 S. Jeffery. There are photographs of Ms. [Redacted] Jeep Compass that Mr. [Redacted] ran into, breaking the right side mirror. (Attachment 20, 31).

The **Police Observation Device (POD) 824** at 7500 S. Jeffery Boulevard pans, showing east and west views of 75th Street and a southeast view of Jeffery Boulevard. At 13:46:04 hours the POD is focused on the police action east of the POD on 75th Street. Between 13:46:04 and 13:46:05 hours, Officer Fry is behind his squad car and on the passenger side of the Charger with his weapon in the ready pistol position. The driver's door of the Charger opens, Mr. [Redacted] gets out, and Officer Toth appears to have him in his grasp. Mr. [Redacted] however, eludes Officer Toth and begins to run south with Officer Toth behind him. Officer Fry maintains his ready pistol position and waits for the Charger, which is still in gear, to roll past him. Between 13:46:05 and 13:46:06 hours, Mr. [Redacted] and Officer Toth, who is chasing him, run between two parked cars. Officer Toth is approximately three to four feet behind him. Officer Fry, approximately 21 feet behind Officer Toth, is pointing his gun in the direction of Mr. [Redacted] At 13:46:07 hours, Officer Fry appears to begin shooting at Mr. [Redacted] who is approximately 30 feet away, passing the side door of South Shore Food Market. Officer Toth, approximately 12 feet behind Mr. [Redacted] stops running. At 13:46:08 hours, Mr. [Redacted] crouching low, runs past the window of the South Shore Food Market and turns the corner. At 13:46:10 hours, Officer Toth is by the window of the South Shore Food Market, while Officer Fry, approximately 30 feet away from Officer Toth, continues to point his gun in Mr. [Redacted] direction of flight. At 13:46:11 hours, Officer Fry moves diagonally from the center of 75th Street towards the southeast corner of 75th and Jeffery, while pointing his pistol in the direction of Mr. [Redacted] Officer Fry continues to point his gun in the direction of Mr. [Redacted] until 13:46:14 hours. (Attachment 29).

**POD 823** at 7558 S. Jeffery Boulevard is too far away to capture the incident. From that distance a flashing light (fire engine) can be seen at 75th and Jeffery Boulevard at 13:47:30 hours. Police cars are seen passing 76th and Jeffery Boulevard northbound, beginning at 13:47:42 hours, in route to assist at the crime scene. (Attachment 30).

The **OEMC calls** on 7 January 2013, between the hours of 13:42 and 16:04, revealed that the incident began when a caller reported to the 911 dispatcher that a group of approximately seven black males were beating one individual in the [Redacted] [Redacted]. Some members of the group got into a silver Dodge Magnum. Another caller reported that five males blacks beat the individual, took his car, and drove north on Essex.

At 13:44:49 hours, the victim, [Redacted] called 911 from 75th and Kingston. He reported that 10 individuals had beaten him and taken his shoes, wallet, and car. His

car was described as a silver/gray 2008 Dodge Charger, with Wisconsin plates, Redacted The car was driven down 75th Street. At 13:44:48 hours, a female caller to 911 reported that a female, who had been beaten and robbed of her coat and shoes, at Redacted needed police assistance at 7545 S. Phillips. At 13:57:12 hours, a caller reported that a group of people (now know to be Officer Fry) were shooting at 75th and Jeffery. (Attachment 69).

The **OEMC radio transmissions for Zone 8** reveal that the dispatcher radioed that there was a battery-in-progress, involving eight black males, some of whom got out of a silver Dodge Charger at Redacted Twenty-three seconds later, the dispatcher radioed that the incident was a robbery that had just occurred. Sixteen seconds later, the dispatcher radioed that a caller at 7548 S. Kingston reported that his car, a silver gray Dodge Charger, had been hijacked. Seventeen seconds later, Beat 463E asked for a confirmation of the vehicle's description, and seven seconds later reported that they were behind that vehicle. Nineteen seconds later, Beat 463E reported shots fired by the police at 75th and Jeffery. (Attachment 32).

The **Event Query** for the incident (Event #1300707490) was initiated with a call of a robbery that just occurred, at 7548 S. Kingston Avenue, at 13:45:07 hours. Beat 412 was dispatched at 13:45:34 hours. Beat 463E was dispatched at 13:46:02 hours and reported that they were behind the vehicle at 13:46:13 hours. At 13:46:27 hours Beat 463E gave a location of 75th and Jeffery (after the announcement that shots had been fired by the police. (Attachment 36).

The **video camera** at **South Shore High School** did not capture the incident. That camera is directed at the southwest corner of 75th and Jeffery. The Safe Passage worker, Redacted appears startled and ready to flee westbound at 13:46:08 hours. Officer Fry is observed getting into the moving, driverless, Dodge Charger and stopping it at 13:47:10 hours in the westbound lane of the 75th and Jeffery intersection. (Attachment 61).

There were three outside **video surveillance cameras at South Shore Food Market**, 7501 S. Jeffery Boulevard, recording the incident.[2] Camera 1, located at 7503 S. Jeffery Blvd., recorded Jeffery Blvd., northbound toward 75th Street. At 13:35:45 hours two male subjects were recorded walking northbound on Jeffery toward 75th Street. At 13:54:10 hours the subjects were recorded running back southbound. Camera 2, located at 7509 S. Jeffery Blvd., recorded Jeffery Blvd., southbound toward 76th Street. That camera recorded the two subjects walking northbound at 14:01:57 hours and running back southbound at 14:02:14 hours. Cameras 1 also records Officer Fry entering the moving Charger to stop it at 13:54:21 hours. A fire truck arrives at the scene at 13:55:11 hours.

Camera 3 shows Officer Toth chasing Mr. Redacted between two parked cars. At 13:44:37 hours, Officer Toth is seen running approximately three to four feet behind Mr. Redacted Both of Mr. Redacted arms and hands are extended away from his body and

---

[2] The times of the three cameras are not synchronized.

raised to shoulder height. At 13:44:38 hours, as Mr. [Redacted] turns sideway to run between the cars, both of his arms are extended away from his body; his left hand appears to be touching one of the parked cars while his right arm is fully extended, shoulder high and slightly behind him. Mr. [Redacted] appears to have the cell phone box in his right hand. Officer Toth is behind Mr. [Redacted] and slightly to Mr. [Redacted] right side. The cell phone box appears to be approximately four feet away from Officer Toth's face. At 13:44:39 hours, Mr. [Redacted] head appears to turn to the right. His arms are down about waist high and slightly away from his body, as he gains distance from Officer Toth, who is approximately eight feet behind Mr. [Redacted]. Officer Toth points his gun at Mr. [Redacted] but lowers it at 13:44:40 hours as they leave the camera's viewing area. (Attachment 28).

The **Report of Postmortem Examination** documented that on 08 January 2013, a postmortem examination of Mr. [Redacted] was performed by Dr. [Redacted]. Dr. [Redacted] identified a through-and-through wound to Mr. [Redacted] right forearm. She identified another gunshot wound to the right side of Mr. [Redacted] body. The eighth rib was fractured by that bullet's entry. That bullet passed through the liver, diaphragm, pericardial sac, and heart. The large caliber copper jacketed bullet was recovered adjacent to the thoracic spine.

Dr. [Redacted] stated that Mr. [Redacted] cause of death was multiple gunshot wounds and the manner of death was homicide. (Attachments 6, 67).

On 08 January 2013, a **canvass** was conducted at the location near the incident. No witnesses were found as a result of the canvass. (Attachment 10).

On 9 August 2013, a **law suit** ([Redacted]) was filed in the United States District Court for the Northern District of Illinois on behalf of the [Redacted] [Redacted] The City of Chicago and Officers Toth and Fry were named as defendants. It is alleged that the officers used excessive and unreasonable force. (Attachment 68).

The relevant sections applicable to this incident of **General Order (G.O.) 03-02-03, <u>DEADLY FORCE</u>,** are quoted below:

II.　DEPARTMENT POLICY
    A.　A sworn member is justified in using force likely to cause death or great bodily harm only when he or she reasonably believes that such force is necessary:
        1.　to prevent death or great bodily harm to the sworn member or another person, or:
        2.　to <u>prevent an arrest from being defeated by resistance or escape</u> and the sworn member reasonably believes that the person to be arrested:
            a.　has committed or has attempted to commit a <u>forcible felony</u> which involves the infliction, or threatened

      infliction, or threatened use of physical force likely to cause death or great bodily harm or;
  b. is attempting to escape by use of a deadly weapon or;
  c. otherwise indicates that he or she will endanger human life or inflict great bodily harm unless arrested without delay. (Attachment 84).

  On 1 March 2013, **Witness** Redacted was interviewed at IPRA. Mr. Redacted stated that on 7 January 2013, he was working for Safe Passage and assigned to a post at the southwest corner of 75th and Jeffery, at South Shore International College Prep. Mr. Redacted stated that there were two black males with dreadlocks in their hair in the Charger.[3] Two white male police officers in a gray Crown Victoria parked on the north side of the Charger. He saw the driver jump out of the car and run, and he did not notice anything in his hands. The driver ran west on 75th Street and turned south on Jeffery, then east into the alley. Mr. Redacted observed one officer chasing him. He observed the second officer chasing the other black male, who got shot and fell on the southeast side of 75th and Jeffery. The officer who was chasing the subject who got shot was saying, "Freeze. Stop. – Stop. Freeze."[4] Mr. Redacted said, "I just took off running straight west." He heard two to five shots. When Mr. Redacted turned around, he saw a subject lying on the ground. The subject said, "ahh, you got me, you hit me."[5] The officer said, "Just be still, don't move."[6] (Attachment 63).

  On 7 January 2013, **Witness Police Officer Lou Toth**, Star #16663, was interviewed at Area South. Officer Toth stated that on 7 January 2013, he was assigned to Beat 463E with Officer Kevin Fry. Officer Toth was the driver of their unmarked squad car. At approximately 1347 hours, Officer Toth observed a silver Dodge Charger fail to come to a complete stop at a stop sign at 75th and Essex. Officer Toth ran the license plate on his car's PDT and learned that the Charger was clear registered to a subject in Milwaukee, as it went westbound on 75th Street.

  Officer Toth then heard an OEMC dispatched message of a battery-in-progress at 76th and Essex, involving teens who had exited a silver Charger. That message was soon updated to a robbery-in-progress, in which a silver Charger with a Wisconsin plate was taken. Officer Toth went westbound on 75th Street to attempt to find the Charger. He observer the Charger stopped in traffic at 75th and Jeffery.

  Officer Toth stopped his vehicle next to, and a little past, the front end of the passenger's side of the Charger. He observer a black male (now know as Cedrick Chatman) in the driver's seat. Officer Toth exited his car, identified himself as a police officer, and ordered Mr. Chatman to "put his hands up." Officer Toth stated, "Um while

---

[3] Mr. Redacted seemed to have been confused as to the number of persons involved in the incident. There were two subjects who arrived at the southeast corner of 75th and Jeffery as the incident unfolded. Those subject immediately turned and ran south on Jeffery.
[4] Redacted page 15, lines 19-21.
[5] *Id.*, page 25, lines 7-8.
[6] *Id.*, page 25, lines 8-9.

continuing to identify myself as the police and continuing to tell him to put his hands up, uh the individual put one, his one hand up which I believe was his right and proceeded to go to the floor of the car inside with his left hand."[7] Officer Toth continued, "I move to the driver's side and I uh, um, as I'm continuing to approach the driver's side, he's still reaching toward the bottom of the car which I assume is he's picking up a weapon at this time, being that it's involved in a carjacking."[8] Mr. [Redacted] opened the driver's door and fled southbound toward the south side of 75th Street. Officer Toth stated, "Um as he's fleeing, I'm tellin' 'em to stop and he's looking directly at me. And I'm looking directly at him like I'm doin' to you [IPRA Inv. Neubeck] right now. Right in his eye."[9] Mr. [Redacted] ran between two parked cars and switched direction, running and looking westbound. Officer Toth stated, "Initially I was almost right on top of 'em at when he exited the car. And then as we got to the sidewalk um, a, a distance started to come between us."[10] Officer Toth stated, "And now he begins to make a movement towards his right."[11] Officer Toth continued, "Um, after he begins to make a move toward his right, uh I hear gunshots go off."[12] "I initially heard three [gunshots]," he said.[13] "I never saw his hands," Officer Toth said, "I completely stared right at his head."[14]

The gunshots initially caused Officer Toth to slow his pursuit because he did not know where the shots were coming from. As Officer Toth rounded the southeast corner of 75th and Jeffery, he saw Mr. [Redacted] lying in the street. Officer Toth heard Mr. [Redacted] say, "I give up. I'm shot."[15] Officer Toth handcuffed him and noticed a gunshot wound in Mr. [Redacted] right forearm. Mr. [Redacted] had nothing in his hands. Officer [Redacted] stated that Officer Fry flagged down a passing fire engine, "And it was after that fact that I see a big black box that's uh next to the offender uh closer onto the sidewalk."[16] (Attachment 52).

On 15 July 2014, **Accused Police Officer Kevin Fry**, Star #15329, was interviewed at IPRA. Officer Fry stated that on 7 January 2013, he was assigned to Beat 463E with Officer Toth. Officer Fry provided essentially the same information as that provided by Officer Toth during his interview. Officer Fry stated that when he and Officer Toth stopped next to the Charger, Officer Toth crossed in front of the Charger, while he (Officer Fry) went to the rear. Mr. [Redacted] exited the car and fled. Officer Fry could not see his hands. Officer Fry came from behind the rear of the Charger and ran diagonally across 75th Street in a southwest direction. Officer Fry stated, "At which point, when the driver of the vehicle [Mr. [Redacted]] reached the corner, he [Mr. [Redacted]] began to turn to his right slightly. I observed in his right hand a dark gray or black object which I believed to be a handgun. In fear of [sic] Officer Toth's life and my own life, I

---

[7] Toth, page 13, lines 13-18.
[8] *Id.*, page 14, lines 9-14.
[9] *Id.*, page 14, lines 28-31.
[10] *Id.*, page 15, lines 22-25.
[11] *Id.*, page 15, lines 10-11.
[12] *Id.*, page 16, lines 6-7.
[13] *Id.*, page 16, line 10.
[14] *Id.*, page 15, lines 15 and 18.
[15] *Id.*, page 17 lines 22-23.
[16] *Id.*, page 19, lines 26-28.

fired four shots at the driver of the vehicle [Mr. Redacted]."[17] Officer Fry stated that he felt that Mr. Redacted posed a threat "When he slowed down at the corner and began to turn to his right."[18] Officer Fry described Mr. Redacted's body movement, stating, "It was more of an upper torso turn from what I remember."[19] Officer Fry fired his weapon from a standing position approximately fifteen to twenty-five feet away from Mr. Redacted There was no object between him and Mr. Redacted when he fired. Officer Fry stated that Mr. Redacted did not extend his arm toward him or Officer Toth. Officer Fry stated, "I sliced the pie around the corner, at which point I observed Officer Toth was placing him into custody."[20] Officer Fry said, "I didn't realize he was shot until I had rounded the corner and he was laying [sic] in the street."[21] Officer Fry then observed Officer Toth place Mr. Redacted in custody. Officer Fry entered and stopped the Charger, which was still rolling through the intersection. He then flagged down a passing fire truck to administer emergency aid to Mr. Redacted (Attachment 81).

**CONCLUSION:**

The Reporting Investigator recommends that Allegation 1, that Officer Fry disobeyed the Chicago Police Department's use of deadly force policy by using excessive and unjustified deadly force against Mr. Redacted by shooting him, be sustained. Officer Fry's partner, Officer Lou Toth, stated that when he ordered Mr. Redacted to raise his hands while Mr. Redacted was still inside the vehicle. Officer Toth stated that Mr. Redacted raised his right hand and reached to the floor with his left hand.[22] Officer Fry, who was on the passenger side of the Charger, never stated that he was able to see the movements of Mr. Redacted. Mr. Redacted then opened the car door to flee. Officer Toth stated that, initially, he was almost on top of Mr. Redacted. POD 824 shows that Officer Toth grabbed, or came close to grabbing, Mr. Redacted soon after Mr. Redacted exited the Charger. Officer Toth stated that he could not see what was in Mr. Redacted hands because he (Officer Toth) stared at the back of Mr. Redacted head. However, Officer Toth also stated that as Mr. Redacted was fleeing, he was looking into Mr. Redacted eyes. The Charger was moving between Officer Fry and Officer Toth, obstructing Officer Fry's view, as Officer Toth pursued Mr. Redacted Camera 3 from the South Shore Food Market shows that as Mr. Redacted ran sideways between two parked cars, a narrow space of 1 foot 8 inches, Mr. Redacted was holding the iPhone box in his right hand, approximately four feet from Officer Toth's face and view.[23] Officer Toth should have been trained to observe what is in a subject's hands first and should have looked at the hand that had reached down to the floor inside the car, since Officer Toth stated that he believed Mr. Redacted was reaching for a weapon. Officer Fry was approximately 21 feet

---

[17] Fry, page 6, lines 20-24 and page 7, line 1.
[18] *Id.*, page 8, lines 3-4.
[19] *Id.*, page 13, lines 3-4.
[20] *Id.*, page 7, lines 3-5. ("Slicing the pie" is a technique used to traverse a corner using a series of small 90 degree side-steps from a "pivot point." After every step one pauses to scan each section or "slice of the pie.")
[21] *Id.*, page 9, lines 19-20.
[22] Officer Toth was uncertain about which hand Mr. Redacted raised and which one reached to the floor.
[23] The distance between the cars was measured by the evidence technician.

behind Officer Toth, who was behind Mr. Redacted and obstructing Officer Fry's view of Mr. Redacted[4]

Officer Toth stated that he slowed his pursuit when he heard three shots. POD 824 shows that Officer Toth stopped running and began to cautiously walk along the side of the wall. Officer Toth's sudden slowdown supports the conclusion that Officer Fry began shooting at Mr. Redacted at that point. POD 824 shows Mr. Redacted crouched low as he runs towards the corner. Officer Toth stated that when he turned the southeast corner of 75th and Jeffery and saw Mr. Redacted lying on the ground. Officer Toth stated that Mr. Redacted had nothing in his hands. Later, Officer Toth noticed an iPhone box nearby.

Since Officer Toth stated that he never saw anything in Mr. Redacted hands, he could not have alerted Officer Fry that Mr. Redacted had a gun. POD 824 shows Officer Fry pointing his gun at Mr. Redacted from the beginning of the vehicle stop to the end of the foot pursuit. Officer Fry did not shout a warning to Mr. Redacted. Officer Fry did not engage in the foot pursuit with Officer Toth; instead, he kept his gun trained on Mr. Redacted. Officer Fry stated the when Mr. Redacted turned to his right to look at him and Officer Toth; he (Officer Fry) began shooting. However, from the very beginning of the foot pursuit, Mr. Redacted and Officer Toth were, according to Officer Toth, looking into each other's eyes. Camera 3 from South Shore Food Store shows that as Mr. Redacted ran past the cars, after running between them, he turned his head to the right. Officer Fry stated that Mr. Redacted did not extend his arm toward either officer. POD 824 appears to show Officer Fry began firing his gun as soon as Mr. Redacted got clear of the parked cars. Although, Officer Fry stated that he fired his gun at Mr. Redacted when Mr. Redacted reached the corner and "turned slightly." However, a bullet, fired by Officer Fry from approximately 30 feet away, impacted or chipped the brick wall of South Shore Foods 13 feet east of the southeast corner of 75th and Jeffery. Officer Toth slowed his chase at approximately 14-15 feet east of the southeast corner of 75th and Jeffery.

According to Officer Fry, he never saw anything in Mr. Redacted hands until Mr. Redacted reached the corner. However, Officer Fry's gun was aimed at Mr. Redacted from the beginning of the traffic stop, until Mr. Redacted was shot and lying in the street. Officer Toth, who was at one point was "on top of" Mr. Redacted, never told Officer Fry that Mr. Redacted had a gun. Officer Fry should have been trained to rely on his partner's observations. Officer Toth was always in position to determine if Mr. Redacted was armed. When Officer Fry saw the object, he did not know what it was. Officer Fry was more than his estimated 25 feet away from Mr. Redacted when he shot him. Officer Fry had a clear shot, but he never had a clear view of what was in Mr. Redacted hands. He described what was in Mr. Redacted hand as a dark gray or black object. He stated that Mr. Redacted did not point the object at him or Officer Toth.

Officer Fry cites the reasoning in G.O. 03-02-03, <u>Deadly Force,</u> Section II-A-1 to justify his actions. That section directs that "A sworn member is justified in using force likely to cause death or great bodily harm only when he or she reasonably believes that

---

[4] The Forensic Investigator measured 75th Street and determined it was 42 feet wide. Officer Fry stood in the middle of 75th Street as Officer Toth reached the curb an estimated 21 feet away.

such force is necessary to prevent death or great bodily harm to the sworn member or another person." When Officer Fry fired his weapon, Mr. Redacted was rapidly increasing his distance from the officers and, according to Officer Fry, had reached the corner. POD 824 shows that Officer Toth had stopped running. Mr. Redacted continued to run while ducking, crouching, and/or wincing after being shot. Mr. Redacted was shot in his right forearm and in his side by Officer Fry. According to Officer Fry, at that point he (Officer Fry) was "slicing the pie." It was not reasonable for Officer Fry to believe that Mr. Redacted who was getting away, endangered his (Officer Fry's) life or the life of his partner, by slowing down and "turning slightly" with an unknown object in his hand. POD 824 does not show Mr. Redacted slowing down. The allegation that Officer Fry's use of deadly force was excessive and not justified is sustained by a preponderance of the evidence.

**FINDINGS:**

**Accused #1**   **Police Officer Kevin Fry, Star #15329, Unit 004**

**Allegation #1**   **Sustained** – Violation of Rule 6, "Disobedience of an order or directive, whether written or oral" in that on 7 January 2013, at approximately 13:46 hours, at 2005 East 75th Street, Chicago, Illinois, Police Officer Kevin Fry, Star #15329, while on duty, violated the provisions of G.O. 03-02-03, Deadly Force, Section II-A, the Chicago Police Department's use of deadly force policy, by using deadly force against **Redacted** without lawful justification.

Typed by Lorenzo Davis #30

_____
Investigator Grace Wilson, Badge #110, IPRA

_____
Investigating Supervisor Lorenzo Davis, #30, IPRA