IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION

| | |
|---|---|
| LINDA CHATMAN, as Special Administrator of the Estate of CEDRICK CHATMAN, deceased,<br><br>        Plaintiff,<br>v.<br><br>The CITY OF CHICAGO, a municipal corporation, LOU TOTH, KEVIN FRY, and others not presently known to Plaintiff,<br><br>        Defendants. | Case No. 13 CV 5697<br><br>Hon. Robert W. Gettleman<br><br><u>Jury Demanded</u> |

## **PLAINTIFF'S *DAUBERT* MOTION**

NOW COMES the plaintiff, Linda Chatman, Administrator of the Estate of Cedrick Chatman, deceased, by her attorneys, Brian W. Coffman, Coffman Law Offices, Mark F. Smolens, Richard R. Mottweiler, and Nicole L. Barkowski, Mottweiler and Smolens, LLP respectfully move this Honorable Court to bar Defendant from eliciting certain testimony from one of his experts, Emanuel Kapelsohn. In support thereof, plaintiff states as follows:

Defendant Kevin Fry has identified Emanuel Kapelsohn as an expert at trial. Kapelsohn's intended testimony and opinions -- if an opinion can be gleaned from his report at all -- are set out in a lengthy report including his curriculum vitae, a copy of which is attached as Exhibit 1. Many of the statements contained in Kapelsohn's report are either irrelevant, go beyond his expertise, are conclusory, or would not be helpful to the jury. As detailed below, and discussed in Exhibit 2,[1] Kapelsohn's report contains a

---

[1] Exhibit 2, attached hereto is an affidavit provided by William Harmening, a consulting expert for purposes of this *Daubert* motion. Plaintiff anticipates that while defendant will seek to

1

number of statements that should not be allowed to be repeated in front of the jury in the instant case.

A.   **Standards for Admissibility**

The admission of expert testimony is controlled by the provisions of Federal Rule of Evidence 702:

> A witness who is qualified as an expert by knowledge, skill, experience, training, or education may testify in the form of an opinion or otherwise if:
> **(a)** the expert's scientific, technical, or other specialized knowledge will help the trier of fact to understand the evidence or to determine a fact in issue;
> **(b)** the testimony is based on sufficient facts or data;
> **(c)** the testimony is the product of reliable principles and methods; and
> **(d)** the expert has reliably applied the principles and methods to the facts of the case.

In *Daubert v. Merrell Dow Pharm. Inc.,* 509 U.S. 579 (1993), the Supreme Court explained that it is the district court's role to act as a gatekeeper before admitting expert scientific testimony in order to "ensure that any and all scientific testimony or evidence admitted is not only relevant, but reliable. *Daubert*, 509 U.S. 589, 597. Courts are not

---

strike this affidavit, Rule 26(a)(2) requires that a party "disclose to the other parties the identity of any [expert] witness *it may use at trial*[.]" Fed.R.Civ.P. 26(a)(2)(A) (emphasis added). The plain language of Rule 26(a)(2) limits the rule to experts who may testify at trial. Harmening will not be testifying at trial. Rule 26(a)(2) does not support striking Harmening's affidavit -- which is to be used by this Court in making its *Daubert* determination into the efficacy of the disclosed opinion testimony proffered by the witness. See *Moore v Napolitano*, 926 F. Supp 2d 8, 25 n. 12 (D.C. Cir. 2013). Indeed, this Court may consider inadmissible materials in regards to a *Daubert* motion. *Daubert* 509 U.S. at 593 n. 10, See also Fed. R. Evid. 104(a). The burden is on the party seeking to present, testimony under Rule 702 to demonstrate that the testimony meets the requirements of the Rule and of *Daubert*. Fed.R.Evid. 702 Advisory Committee Notes to 2000 Amendment (stating that the admissibility of all expert testimony is governed by Rule 104(a) under which the proponent has the burden of establishing admissibility by a preponderance of the evidence). It is not the job of the opposing party to make a record of the factual basis of the expert's testimony by way of a deposition (which under Rule 26(b)(4)(C) is generally at the expense of that opposing party). See *Gregory v. Oliver,* No. 00 C 5984, 2002 WL 31972165 at *1-2 (N.D.Ill. Dec. 27, 2002) (Shadur, J.). Rather, it is the responsibility of the party offering the testimony. *Id.*

permitted to take on faith whatever a paid expert claims, *Minasian v. Standard Chartered Bank, PLC,* 109 F.3d 1212, 1216 (7th Cir. 1997), even if the expert possesses truly distinguished credentials. *Rosen v. Ciba-Geigy Corp.,* 78 F.3d 316, 319 (7th Cir. 1996). The insistence on reliability helps to ensure the integrity of the judicial process. *Mid-State Fertilizer Co. v. Exchange Nat'l Bank of Chicago,* 877 F.2d 1333, 1340 (7th Cir. 1989). Because, as the Court specifically noted in *Daubert*:

> "[e]xpert evidence can be both powerful and quite misleading because of the difficulty in evaluating it[, t]he judge in weighing possible prejudice against probative force under Rule 403 of the present rules exercises more control over experts than over lay witnesses."

*Daubert,* 509 U.S. at 595, *quoting* Weinstein, 138 F.R.D., at 632.

In assessing whether an expert's testimony is reliable, *Daubert* lists a number of considerations -- including testing, peer review, error rates, and acceptability in the relevant scientific community. *Daubert*, 509 U.S. at 593-94. The 2000 Advisory Committee's Notes to Rule 702 suggest additional criteria for gauging expert reliability, including whether: (1) "maintenance standards and controls" exist; (2) the testimony relates to "matters growing naturally and directly out of research they have conducted independent of the litigation," or was developed "expressly for purposes of testifying"; (3) "the expert has unjustifiably extrapolated from an accepted premise to an unfounded conclusion"; (4) "the expert has adequately accounted for obvious alternative explanations"; (5) "the expert is being as careful as he would be in his regular professional work outside his paid litigation consulting"; and (6) "the field of expertise claimed by the expert is known to reach reliable results for the type of opinion the expert

3

would give." See *Fuesting v. Zimmer, Inc.*, 421 F.3d 528, 534-35 (7th Cir. 2005) (citations omitted), *vacated in part on other grounds*, 448 F.3d 936 (7th Cir. 2000), *quoting* Fed. R. Evid. 702 advisory committee's note (2000); s*ee also Am. Honda Motor Co., Inc. v. Allen*, 600 F.3d 813, 817 (7th Cir. 2010). "The goal of *Daubert* is to assure that experts employ the same 'intellectual rigor' in their courtroom testimony as would be employed by an expert in the relevant field." *Jenkins v. Bartlett*, 487 F.3d 482, 489 (7th Cir. 2007) (citations omitted).

Courts in reliance upon *Daubert* and its progeny have determined that certain expert testimony is simply not admissible. Testimony that is not helpful to the jury is not admissible. To be helpful, the proffered testimony must concern a matter beyond the understanding of the average person. See *United States v. Allen,* 390 F.3d 944, 949-950 (7th Cir.2004); *United States v. Mansoori,*304 F.3d 635, 653-654 (7th Cir.2002); *United States v. Young,* 316 F.3d 649, 656-659 (7th Cir. 2002). Since an "`opinion has a significance proportioned to the sources that sustain it,'" *Huey v. United Parcel Service, Inc.,* 165 F.3d 1084, 1087 (7th Cir.1999), an expert who provides nothing but a bottom line supplies nothing of value to the judicial process. *Minasian,* 109 F.3d at 1216. Expert opinions about legal issues that determine the outcome of a case are impermissible. *Naeem v. McKesson Drug Co.,* 444 F.3d 593, 610 (7th Cir. 2006). Expert opinion that is intertwined inextricably with, and rests on improper credibility determinations, is not admissible. See *Jordan v City of Chicago*, No 08 CV 6902, 2012 WL 88158 (N.D.Ill. Jan, 11, 2012) (citations omitted)(determining the weight and credibility of witness testimony is the exclusive province of the jury and that experts are not permitted to offer opinions as to the believability or truthfulness of that testimony).

"Expert testimony that rests solely on `subjective belief or unsupported speculation' is not reliable, and not admissible." *Daubert,* 509 U.S. at 590.

    B.  **Kapelsohn's proffered testimony will not be helpful to the jury.**

    Plaintiff submits that there is no need for Kapelsohn's "expert" testimony in this case. The ultimate issue that the jury will be called upon to determine in this case is whether Officer Fry used more force than was reasonably necessary against Cedrick Chatman under the circumstances he faced at the intersection of 75th Street and Jeffrey Boulevard during the early afternoon hours of January 7, 2013. The jury will be instructed as to the legal standards for what constitutes reasonable force in this context. Kapelsohn's testimony is merely an attempt to step into the jury's shoes, in a way that will not be particularly helpful, in determining disputed matters. Here, the standards in question are generally applicable legal standards that lay juries can apply on their own without "expert" help. *See* Fed. R. Evid. 702(a). Any questions of law, such as the meaning of applicable legal standards, should be resolved by the court and are not the appropriate subject of expert testimony. *See Jordan v City of Chicago*, No 08 CV 6902, 2012 WL 88158 (N.D.Ill. Jan, 11, 2012) (internal citations and quotation marks omitted).

    Further, the jury in this case does not need an "expert" opinion on what the videos of this incident show or do not show. The jury in this case does not need an "expert" to tell them what an iPhone box is shaped like, or looks like. The jury in this case does not need an "expert" to tell them, demonstrate to them, create for them, or show them videos of how fast someone can turn. This is a case about whether the force used in a particular situation was proper under the Constitution. Expert testimony is not needed. Kapelsohn's testimony is irrelevant because it addresses an issue within the

5

common knowledge of the average layperson and does little more than tell the jury which result to reach. Not only should Kapelsohn's testimony be excluded because it does not meet the requirements of *Daubert*, it should be excluded under Rules 401 and 403 because it would be distracting and a waste of time. Any marginal probative value of Kapelsohn's testimony is substantially outweighed by "considerations of undue delay, waste of time, or needless presentation of cumulative evidence." See FRE 403.

    C.  **Kapelsohn's report contains conclusions that he is not qualified to make.**

Kapelsohn is a non-practicing attorney, gun enthusiast, firearms instructor, and self-proclaimed expert marksman, but a behavioral psychologist, pathologist, physiologist he is not. Nor is he police officer, something he never has been. There is nothing in his professional training and experience to that qualifies Kapelsohn to explain the science of human perception and cognition, or the trajectory of a bullet in the human body. Although, Kapelsohn has provided a 50 plus page CV to express his qualifications, as noted above this Honorable Court need not take on faith whatever a paid expert claims, *Minasian,* 109 F.3d at 1216, even if he did (which is certainly not conceded here!) possess truly distinguished credentials. *Rosen.,* 78 F.3d at 319. Kapelsohn reasons that because he has a "certificate" from the Force Science Institute, he is qualified to render opinions related to human reaction times, action vs reaction, human perception under high stress situations. However, while it is possible that Mr. Lewinski could testify as to these matters had he been listed as a witness, Kapelsohn plainly and simply is not so qualified to by simply having attended a class or training session. Ironically, the City of Chicago, or at least the purportedly Independent Police Review Authority has decide to cut ties with and will no longer be sending its

investigators to Lewinski and his Force Science Institute for training purposes.[2] Because juries untimely place great credibility on a expert testimony, this court should not allow Kapelsohn to testify as to matters for which he is not qualified. Kapelsohn's report includes a section titled "The Deceased's Bullet Wound, and the Video Evidence are Consistent with the Officer's Account of the Shooting." This entire section should be rejected outright because Kapelsohn is in no way qualified to provide expert testimony on the subject of bullet wounds and the behavioral characteristics of a bullet as it passes through the human body.

D. **Kapelsohn's report is rife with unsubstantiated unscientific conclusions.**

Kapelsohn should not be allowed to testify as to the patently unscientific conclusions contained in his report. As discussed in Harmening's affidavit (Exhibit 2 hereto), Kapelsohn's report draws the factual conclusion that "the iPhone box looked like a gun." Kapelsohn cannot be allowed to render this type of testimony, because that opinion is irrelevant, unreliable, and will impermissibly invade the very province of the jury's considerations in this case. The jury can view the iPhone box themselves and draw their own conclusions as to any purported similarity between a handgun and the box. An equally problematic/impermissible conclusion in Kapelsohn's report is "[t]here have been many police shootings of suspects who have had cell phones, pages, black

---

[2] See Chip Mitchell, WBEZ, City sends police shooting investigators to trainer accused of pro cop bias, Sept. 28, 2015 available at https://www.wbez.org/shows/wbez-news/city-sends-policeshooting-investigators-to-trainer-accused-of-procop-bias/60dabb6f-bae7-4aea-a952-e4f59ba3a156
See also Chip Mitchell, WBEZ, City To Quit Ordering Police-Shooting Investigators To Change Findings, Mar. 24, 2016 available at https://www.wbez.org/shows/wbez-news/city-to-quit-ordering-policeshooting-investigators-to-change-findings/9541d60c-1af8-48bd-aef9-a5a4479aa072

wallets, black or shiny metal items, toy guns, replica guns, Airsoft or BB guns, or other innocent objects in their hands…If the totality of the circumstances was such as to make it reasonable for the officer to believe that the object was a weapon, many of those shootings have been ruled justifiable." (Kapelsohn Report, p. 9). This assertion is patently prejudicial, as jurors may give undue weight, or to credit the expert's view point instead of relying on its own. This is truly problematic where the jury does not know the facts of these other shootings and has no basis to judge the assessment or investigation of these other shootings. It is undisputed that Cedrick Chatman did not have a gun or a weapon (unless the jury were to believe that Chatman could cause grievous injury by throwing the box at the officers). Mr. Kapelsohn should not be allowed to come into this court and tell the jury otherwise simply because the City of Chicago has paid him thousands of dollars to do so. *See* Exhibit 1 hereto.

E. **Kapelsohn's testimony will not help the jury because it provides legal conclusions.**

The Seventh Circuit Court of Appeals has excluded expert testimony on issues that are ultimately the province of the jury. For example, in *Thompson v. City of Chicago,* 472 F.3d 444 (7th Cir. 2006), the Seventh Circuit affirmed the district court's decision to exclude the plaintiff's experts from testifying that the defendant police officer used excessive force, articulating:

> The jury, after having heard all of the evidence presented, was in as good a position as the experts to judge whether the force used by the officers to subdue Thompson was objectively reasonable given the circumstances in this case. Introducing two experts to testify that Officer Hespe used excessive force would have induced the jurors to substitute their own

8

>independent conclusions for that of the experts. In other words, they would have been "induced to decide the case on an improper basis . . . rather than on the evidence presented . . .," which is precisely why the evidence should have been excluded.

*Thompson*, 472 F.3d at 458 (citation omitted).Kapelsohn's report is littered with impermissible legal conclusions about the about the reasonableness of Officers Fry's behavior in light of the Fourth Amendment. The term "objectively reasonable" is interlaced with his opinions. Kapelsohn should not be allowed to offer opinions whether Officer Fry's use of deadly force was "objectively unreasonable." Such testimony provides his own legal conclusions as to whether Officer Fry violated the Fourth Amendment and would improperly invade the province of the jury. *See* Weinstein's Federal Evidence § 704.04[2][a] (2d ed. 2008) (explaining that opinion testimony should be excluded for lack of helpfulness where it "supplies the jury with no information other than the witness's view of how the verdict should read").

In the same vein, Kapelsohn should not be allowed to offer (1) any opinion that Fry actually identified Chatman as a threat; (2) any opinion that Fry reasonably believed he had to shoot immediately to defend himself or Officer Toth and (3) any opinion that Fry was correct, from an action vs reaction perspective, in believing that Chatman was a lethal threat to him. These are impermissible legal conclusions, attempt to bolster Fry's credibility, and improperly invade the province of the jury.

9

F. **Kapelsohn's testimony will not help the jury because his opinions are intertwined inextricably with, and rest on improper credibility determinations.**

Kapelsohn's entire testimony should be excluded because he bases his opinions on versions of the facts which assumes Fry's testimony to be true and gives the impression that he has weighed the credibility of the evidence. Kapelsohn's opinions not only are based on the assumption that Fry's version of the events is true, but actually adopts and endorses Fry's version of events, to wit, that Cedrick Chatman turned and pointed an object at Fry. Much of Kapelsohn's report is akin to an expert testifying that a disputed fact actually occurred rather than an expert giving an opinion based upon factual assumptions, the validity of which is for the jury to decide. *Cf. Richman v. Sheahan,* 415 F.Supp.2d 929, 942 (N.D. Ill. 2006). Specific, patently impermissible examples from the report, include:

- When Chatman, in defiance of Officer Toth's commands, exited the carjacked vehicle and ran from Officer Toth, and Officer Fry then saw Chatman, while running, *begin to turn toward the officers with an object in his hands that looked like a gun* (Kapelsohn Report, p.5) (emphasis added)

- When Chatman, while running, *began to turn toward Officer Toth with an object in his hands that looked like a handgun* (Kapelsohn Report, p. 7) (emphasis added).

- A gun that a suspect is holding so that it is pointed well away from the officer such as with a guns muzzle pointed strait upward, straight downward, or 90 degrees to the right or to the left of the officer, can be brought to bear on the

10

officer and fired on a quarter of a second (.25 seconds) or less. (Kapelsohn Report, p. 8) (emphasis added).

- The only reasonable assumption the officer can make when *he sees a gun -- or what looks to be a gun -- pointed at him or another innocent person is that the "gun"* and the suspect holding it constitute an immediate deadly threat that must be stopped immediately. (Kapelsohn Report, p. 9).

- As applied to Officer Fry's situation when he saw *Chatman turning with what appeared to be a pistol in his hand ….*Toth and Fry…*were already at a tactical disadvantage…*( Kapelsohn Report, p. 9) (emphasis added).

- This is because by the time Officer Fry *could see the handgun,* Chatman had already turned with it in his hand, at least as far as *Fry could see the gun.* The time needed for Chatman *to then point the gun* at Officer Toth -- or for that matter at Officer Fry -- *and fire the gun* was in the order of 0.25 seconds (one quarter of a second) (Kapelsohn Report, p. 9) (emphasis added).

- In this case, Officer Fry says that he began firing when he saw Chatman *begin to turn back toward Officer Toth with what appeared to be a gun in his hand,* and he stopped firing when Chatman turned the corner to the point where the officer lost sight of him (Kapelsohn Report, p. 11) (emphasis added)

- The time that would elapse from when Officer Fry first saw Chatman *turn with the "gun"* until Fry could discharge the shot (Kapelsohn Report, p. 12) (emphasis added)

11

- Finally it is important to understand that once Officer Fry perceived Chatman turning back toward Toth with the "gun" in his hand. (Kapelsohn Report, p. 13) (emphasis added)

- The video of the shooting …[is] consistent with Officer Fry's account of what occurred. (Kapelsohn Report, p. 14) (emphasis added)

- "After spending decades looking at guns of all kinds of conditions, I find it very understandable that, under the circumstances that existed here, Officer Fry got a momentary glimpse of Chatman, running from officer Toth and beginning to turn with the dark grey object in his right hand, and believed the object was a gun. (Kapelsohn Report, p 8).

None of these "opinions" are properly a part of a qualified expert's opinion testimony in this excessive force case.

### G. Kapelsohn's methods are not reliable

Mr. Kapelsohn's "opinions" do not lend themselves to verification by scientific method or testing; they have not and cannot be subjected to peer review; they cannot be evaluated nor are they consistent with generally accepted methods for gathering relevant evidence.[3] As discussed in Mr. Harmening's affidavit (Exhibit 3 hereto) much of Mr. Kapelsohn's methods are unreliable, misrepresent the research and data, and are not peer reviewed. Under Federal Rule 703,the party offering the expert testimony must show that the expert relied on facts or data of the type relied upon by experts in

---

[3] See Gardner v. Tristar Sporting Arms, LTD., 9-cv-671, S.D.Ind (September 27, 2010)(minute order debarring Kapelsohn from offering non-scientific, unreviewable opinions)(attached hereto as Exhibit 3). Nor was Gardner the only case plaintiff's counsel were able to locate in which Mr. Kapelsohn's testimony was not severely limited if not totally barred. See also Washington Post article dated April 12, 2016 (Exhibit 4 hereto) on recent ruling in a Virginia criminal proceeding and Simmons v. Bradshaw, 14 CV 80425 (S.D.Fl. 1/25/16)(Dkt. 262).

the field. Second, the party must show that this reliance was reasonable. See, e.g., *TK-7 Corp. v. Estate of Barbouti,* 993 F.2d 722, 732 (10th Cir.1993) (expert testimony was inadmissible under Rule 703 "where the expert failed to demonstrate any basis for concluding that another individual's opinion . . . was reliable, other than the fact that it was the opinion of someone he believed to be an expert*"); United States v. Smith,* 869 F.2d 348, 355 (7th Cir.1989) ("[A]n expert witness may not simply summarize the out-of-court statements of others as his testimony."); *see also* 29 Charles Alan Wright & Victor James Gold, Federal Practice and Procedure 6274 1997).

    As Harmening's affidavit specifically notes, Mr. Kapelsohn misinterprets the findings of the DOJ Report and that the opinions he draws there from are thus unreliable. Furthermore, Harmening's criticisms of Bill Lewinski and his Force Science Institute are important to guide this Court's gate keeping in this matter because of Kapelsohn's reliance on their questionable research, especially the centerpiece of Kapelsohn's analysis, the 0.25 second time interval. Additionally problematic with Mr. Kapelsohn's report is the fact that some statements are not supported by the facts in this case. For example, Kapelsohn bases his opinions on a screen shot of one of the videos, which he claims shows Cedrick Chatman allegedly turning (a fact which is not entirely clear from the photo) as the impetus for Fry to shoot Chatman. However, defendant Fry's sworn deposition testimony was that the "turn" occurred at the corner of 75th and Jeffery. An expert's opinions must be "factually linked" to the case in order to survive a *Daubert* challenge. *United States v. Gallardo,* 497 F.3d 727, 733 (7th Cir. 2007). Mr. Kapelsohn cannot put forth an alternative scenario wholly made up of Mr. Kapelsohn' personal beliefs or insights. It is for the jury to decide what happened on

January 7, 2013, based upon the testimony of the fact witnesses in this litigation, not from the un-testable personal beliefs of defendant's paid expert witnesses.

Wherefore, for the reasons discussed herein and in Mr. Harmening's affidavit, Plaintiff requests that Mr. Kapelsohn's testimony be excluded in its entirety or severely limited to the opinions Defendant can establish meets the requirements of *Daubert*.

Respectfully Submitted

_/s/ Mark F. Smolens_____
One of Plaintiffs' Attorneys

MOTTWEILER & SMOLENS, LLP
Richard Mottweiler #3123509
Mark Smolens #6190482
Nicole Barkowski #6295834
1627 Colonial Parkway
Inverness, IL 60067
800-934-0805
773 - 580-4982 (MFS)
312-259-0234   (RRM)
978-758-8591   (NLB)
tcblaw@aol.com
nbarkowski@gmail.com
ryansmolensjones@hotmail.com

COFFMAN LAW OFFICES
Brian W. Coffman #6285942
2615 N. Sheffield Suite #1
Chicago, IL 60614
773-348-1295
bcoffmanlaw@gmail.com