IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION

| | |
|---|---|
| LINda CHATMAN, as Special Administrator of the Estate of CEDRICK CHATMAN, deceased, ) ) ) ) | |
| Plaintiff, ) | Case No. 13 CV 5697 |
| v. ) ) | The Hon. Robert W. Gettleman |
| THE CITY OF CHICAGO, a municipal corporation, LOU TOTH, KEVIN FRY, and others not presently known to Plaintiff, ) ) ) ) | Magistrate Judge Geraldine Soat Brown |
| Defendants. ) | |

**PLAINTIFF'S RESPONSE TO DEFENDANT'S MOTIONS IN LIMINE**

NOW COMES the plaintiff, Linda Chatman, Administrator of the Estate of Cedrick Chatman, deceased, by her attorneys, Brian W. Coffman, Coffman Law Offices, Mark F. Smolens, Richard R. Mottweiler, and Nicole L. Barkowski, Mottweiler and Smolens, LLP hereby submits the following in response to Defendant Kevin Fry's motions *in limine*:

**DEFENDANT'S MOTION *IN LIMINE* NO. 1 TO BAR ANY MENTION THAT CHATMAN WAS NOT IN POSSESSION OF A GUN WHEN HE WAS SHOT**

Defendant's motion *in limine* No. 1 to bar mention that Cedrick Chatman was unarmed should be denied in its entirety, as none of the grounds stated justify barring the evidence.

In a case involving whether a police officer's use of force violated the Fourth Amendment, the ultimate question is whether the use of force was "'objectively reasonable' in light of the facts and circumstances confronting" him at the time. *Graham v. Connor*, 490 U.S. 386, 397 (1989) Of course, "[t]he 'reasonableness' of a particular use of force must be judged from the perspective of a reasonable officer on the scene, rather than with the 20/20 vision of hindsight." *Graham*, 490 U.S. at 396. This standard makes "allowance for the fact that police

1

officers are often forced to make split-second judgments -- in circumstances that are tense, uncertain, and rapidly evolving -- about the amount of force that is necessary in a particular situation." *Graham*, 490 U.S. at 396-97. It does not, however, prevent a plaintiff or a fact finder from questioning whether the officer's account of the circumstances surrounding a use of force is credible, or from critically assessing whether the officer's beliefs and perceptions leading to the use of force were reasonable *See Graham, 490 U.S.* at 398 n.12 (noting an officer's subjective motives may be relevant to an assessment of his credibility, even though such motives are generally irrelevant to an "objective reasonableness" inquiry.).

Here, defendant's attempt at reliance on *Sherrod v. Barry,* 856 F.2d 802 (7th Cir. 1988) (*en banc*), is misplaced. The Seventh Circuit in *Sherrod*, specifically cautioned that its holding was not a "black-letter rule" precluding evidence that a shooting victim was unarmed, and that after-the-fact evidence could (as here) not only be used to test a witness's credibility, namely the ability of the witness to "observe, remember, or narrate," but could also (as here) be used to impeach a witness, by demonstrating contradictions in his testimony. *Sherrod*, 856 F.2d at 806.

Our Court of Appeals has expressly relied upon that exception to authorize the admissibility of evidence in this context, noting, "[f]or example, if an officer testifies that `I saw a shiny, metallic object similar to a gun or a dangerous weapon in the suspect's hand,' then proof that the suspect had neither gun nor knife would be material and admissible to the officer's credibility on the question of whether the officer saw any such thing." *Common v. City of Chicago*, 661 F. 3d 940, 944 (7th Cir. 2011), *quoting Sherrod*, 852 F.2d at 806. Because the officer in *Sherrod* did not testify that he saw an object in the deceased's hands, but rather that he saw the suspect make a quick movement with his hand into his coat, *Common,* 661 F. 3d at 944, the evidence that Sherrod was unarmed was deemed to have been irrelevant for impeachment

2

purposes, and the jury had to determine the reasonableness of the officer's action using only those facts known to the officer at the time. *Common,* 661 F. 3d at 944. In *Estate of Escobedo v. Martin*, 702 F.3d 388 (7th Cir. 2012), the Seventh Circuit yet again explained that it had "cautioned . . . against an overly broad reading of" the holding in *Sherrod*. *Escobedo,* 702 F. 3d at 399.

      Thus, based upon *Escobedo, Common*, and *Sherrod,* admitting evidence that Cedrick Chatman was unarmed -- or, as here, "armed" only with an iPhone box and charger -- must be deemed proper where it will be elicited to test witness credibility or accuracy, or impeach a witness, by demonstrating contradictions in the proffered testimony. Officer Fry told IPRA that he wears corrective lenses, for nearsightedness, but did not remember the last time that he had an eye exam before this incident. Fry estimated that he was fifteen to twenty five feet away from Chatman when he fired his weapon. According to Officer Fry, when Chatman "reached the corner he began to turn to his right slightly I observed in his [right] hand a dark object which I believed to be a handgun." See Ex. 1, Fry IPRA Statement at 6:20-23, 13:6-8. When asked, at what point he felt that Chatman posed a threat, Fry responded, "When he slowed down at the corner and he began to turn to his right, I was able to see a dark object believed to be a handgun." Ex. 1, at 8:1-5. Fry estimated that he was fifteen to twenty five feet away from Chatman when he fired his weapon. Ex. 1, at 11:16-19. However, the videos in this case arguably show that Officer Fry started shooting before Chatman reached the corner, actually putting his partner, Officer Lou Toth, in the line of fire. The post-occurrence crime scene video and photos of the scene show that there is utility box and light pole at the corner, where Chatman allegedly made this turn. Fry, however, claims that there were no objects between him and Chatman when he fired his weapon. Ex. 1, at 9:23-10:1. Of course, Fry also testified that he did

3

not see any cars in the street in the area where he discharged his weapon -- in point of fact, a vehicle operated by Rosie Inwang (a City College professor) traveling northbound on Jeffrey appears to have been struck by one of Fry's bullets.

The jury in this case will also hear from Officer Toth, who will testify that when came around the front of the Charger, he could see that there was nothing in Chatman's right hand. Toth ordered Chatman to put hands up, which Chatman partially complied. When Chatman exited the vehicle, Toth was close enough to the vehicle that the door hit him. Toth will also testify that during the encounter, as he followed closely behind Cedrick Chatman, he did not fear for his physical safety.

On January 7, 2013, Officer Fry's only justification given for shooting Cedrick Chatman was that he was in fear of the life of Toth. When Fry gave his statement to IPRA in July 2014 (some 18 months later), Fry claimed that he fired his weapon fearing for his own life, as well as the life of Officer Toth. A couple of days later, in his deposition in this case, Fry again adopted the story that he fired his weapon fearing for his own life, as well as the life of Officer Toth.

According to the Supreme Court, the use of deadly force is unreasonable if intended simply to prevent a felon's escape. *Tennessee v. Garner,* 471 U.S. 1, 11-12, (1985); *see also Ford v. Childers,* 855 F. Supp. 2d 1271, 1276 (7th Cir 1988)) ("[T]he firing of a weapon must never become an automatic response to the law enforcement officer when attempting to capture a fleeing felon."). The fact that Cedrick Chatman was unarmed is relevant to Officer Fry's credibility as to whether he shot Cedrick because Cedrick was running away (due to his desire to apprehend a fleeing carjacker), or as to whether Officer Fry shot Cedrick Chatman because he had a black object in his hand which he reasonably believed to be a weapon. Similar to *Pelzer v City of Philadelphia,* 07 CV 37 (E.D.P.A. Jan. 1, 2011) attached as Exhibit 2, the jury will be

4

asked to determine whether an officer's use of force was reasonable where the officer testifies he saw an object he believed was a weapon, but later learned was not a weapon. In *Pelzer*, the court ruled, "evidence showing Pelzer possessed only a silver cellular phone was highly probative of the reasonableness of Burton's stated belief he was in fear of death or serious injury when he shot Pelzer."

Further, defendant's reliance on *Taylor v, City of Chicago,* No 01 C 2057, 2003 WL 22282386 at *13-15(N.D. Ill Sept. 30, 2003) and *Roos v. Patterson,* No. 10-4073, 2013 WL 3899966 at *10 C.D. Ill July 29, 2013 are also misplaced.  In *Taylor*, a summary judgement decision, the uncontested facts established that the officer shot Taylor because Taylor pointed a gun at him from three feet away. Taylor survived and later testified that he did not intend to harm the officer.  In *Roos,* another summary judgment decision, it was undisputed that the officer observed a man (Roos) covered in blood holding a cleaver and heading towards the back door, where the officer (Patterson) was standing. In *Taylor* and *Roos*, the courts reasoned that the officer was not obligated to correctly assess the victim/assailants intent, only whether the conduct gave rise to an objective belief of immediate danger. *Roos v. Patterson,* No. 10-4073, 2013 WL 3899966 at *10 C.D. Ill July 29, 2013.  This case is in no way factually similar to either case.

The undisputed evidence in the instant case is that the only "weapons" possessed by Cedrick Chatman at the time a Chicago police officer opened fire on a Chicago street corner, shortly before 2:00 p.m. on a sunny weekday afternoon, were a black iPhone box and a cell phone charger. Officer Fry has claimed -- at varying times -- that the decedent either turned, or turned and pointed a dark object, placing him in fear that it was a weapon and this his partner's (and later his) life was in danger. The evidence that Cedrick Chatman was unarmed is directly

5

relevant to Fry's ability to observe that purported weaponry, and the reasonableness of his conclusion that Cedrick had a gun. While Cedrick Chatman is not here to describe his actions, and defend his conduct, the materials in his possession are circumstantial evidence demonstrating the unreasonableness of Fry's conclusion, and the willful and malicious nature of this police execution.

For all of these reasons, defendant's motion *in limine* No. 1 should be denied.

**DEFENDANT'S MOTION *IN LIMINE* NO. 2 TO BAR REFERENCE TO OTHER LAWSUITS, CLAIMED INCIDENTS OR DISCIPLINARY HISTORY**

Defendant's motion in limine No. 2 is premature, and should be denied, without prejudice to re-raising it at trial when the admissibility of specific evidence (not broad categories of evidence) can be considered in context. "Evidentiary rulings should be deferred until trial so that questions of foundation, relevancy and potential prejudice may be resolved in proper context." *Betts v. City of Chicago*, 784 F. Supp. 2d 1020, 1023 (N.D. Ill. 2011). Courts should grant motions *in limine* to exclude evidence "only when the movant shows that the evidence is inadmissible on all potential grounds." *Betts v. City of Chicago*, 784 F. Supp. 2d at 1023. The motion argues that evidence "of Officer Fry's alleged misconduct -- whether in the form of civilian complaints, lawsuits, or discipline" is impermissible propensity evidence, irrelevant, or relevant but unfairly prejudicial. This type of argument, requires anticipating every possible item of evidence that might be used by the other side, and for each one, demonstrating that every possible ground for admissibility is inapplicable. That makes the Court's job difficult, it asks the Court to make this assessment without any evidentiary context. The appropriate course is to deny the motion and allow Defendants to object at trial.

Filing overly broad motions *in limine* is a common practice, and litigants that do so find their motions denied. *See, e.g. Gonzalez v. Olson*, 2015 U.S.Dist Lexis 76203 (N.D.Ill.June 12,

6

2015) (denying without prejudice defendants' motion *in limine* that did not specify what defendants sought to exclude in relation to evidence that City of Chicago improperly trains, disciplines, monitors, or controls police officers'); *Hill v. v. City of Chicago*, 2011 WL 3205304, at \*4 (N.D. Ill. July 28, 2011) (denying without prejudice defendants' motion *in limine* that did not specify what documents defendants sought to exclude in the context of a dismissal of the plaintiff's Brady claim).

FRE 404(b) forbids introduction of evidence of a crime, wrong, or other act "to prove a person's character in order to show that on a particular occasion the person acted in accordance with the character." Fed. R. Evid. 404(b)(1). Other-act evidence may be admissible for other non-propensity purposes, however, "such as proving motive, opportunity, intent, preparation, plan, knowledge, identity, absence of mistake, or lack of accident." Fed. R. Evid. 404(b)(2). To determine whether the exception applies, "the district court should not just ask whether the proposed other-act evidence is relevant to a nonpropensity purpose but how exactly the evidence is relevant to that purpose—or more specifically, how the evidence is relevant without relying on a propensity inference." *United States v. Gomez*, 763 F. 3d 845, 856 (7th Cir 2014)(*en banc).*

Of course Officer Fry may, through his testimony, open the door to the other-act evidence, thus rendering it relevant and admissible as impeachment. In that case, plaintiff should be allowed to explore, comment, respond, or offer evidence in rebuttal to the defendant or his counsel's testimony or comments or references in that regard.

Moreover, such evidence may also be admissible to Officer Fry's credibility. Whether or not Officer Fry has lied, or covered up past instances of misconduct, clearly bears on the Officer's credibility and legitimately calls into question the honesty of his prior testimony. In addition, the plaintiff seeks the imposition of punitive damages against this defendant for his

7

willful and malicious conduct in taking a seventeen year old's life. Evidence relating to a prior such instance of shooting a young black men under questionable circumstances (notwithstanding the Chicago Police Department's and IPRA's yet again finding nothing wrong therein) should be considered by the triers of fact in the context of the punitive damages calculation in this case.

**DEFENDANT'S MOTION *IN LIMINE* NO. 3 TO BAR ANY MENTION OR REFERENCE TO ANY OTHER INCIDENT OF POLICE MISCONDUCT**

Plaintiff objects to motion in *limine* number 3 which seeks to "bar any reference to other incidents of police misconduct, namely those that have been publicized in the media." The motion should be denied, as over broad and premature. Judges in this district have repeatedly denied a similar motion. For example, as far back as 1994, Judge Castillo denied this motion this way:

> "Defendants move to bar any reference of any alleged instances of misconduct by other police officers which have been the subject of current events (e.g., Rodney King) or any references to "videotape" ( e.g., "There was no video camera at the scene of plaintiff's arrest."), contending that such references are irrelevant and designed solely to inflame the passions of the jury. [T]he court agrees that the subject of the prospective jurors exposure to cases of police misconduct (including the more publicized cases) may be wholly appropriate for *voir dire*.
>
> Moreover, the court cannot conclude at this time, that mere references to other acts of police misconduct, to "Rodney King," or to "videotape" are unduly prejudicial. Accordingly, defendants' motion is denied.... While the court will entertain any objection to counsel's arguments at the appropriate time, it is unwilling to muzzle Charles' counsel at this early phase of trial." *Charles v. Cotter*, 867 F.Supp. 648, 664 (N.D.Ill. 1994).

Similarly, in *Padilla.v City of Chicago*, No. 06 C 5462 2013 WL 5486188, 06CV 5462 (N.D.Ill Oct. 2, 2013) and *Regalado v. City of Chicago,* No. 96 C 3634 1998 WL 919712 at * 2(N.D.Ill. Dec. 30, 1998), Judge Shadur denied the same motion as follows:

> Again defense counsel have sought to obtain a bar order in advance of trial on a subject that far better lends itself to consideration in the trial environment. It looks very much as though the motion is one lodged in the Corporation Counsel's Office computer, for this Court's colleague Honorable Ruben Castillo was called

8

on to deal with an identical motion in *Charles v. Cotter*, 867 F.Supp. 648, 664 (N.D.Ill.1994). This Court shares Judge Castillo's "unwilling[ness] to muzzle [plaintiff's] counsel at this early phase" ( id.), and it denies the motion (just as Judge Castillo did). *Id*. at *2.

A similar result is warranted here. By contrast, entertaining this kind of motion is highly prejudicial to Plaintiff because its breadth and generality make it nearly impossible to respond to. Denying the motion does not prejudice the Defendant. His counsel will have the opportunity to challenge this evidence at trial by objection.

**DEEFEDANT'S MOTION IN LIMINE NO. 4 TO BAR ANY REFERENCE TO ANY MOTION PRACTICE RELATED TO THE DISCLOSURE OF THE VIDEOS OF THE SHOOTING**

Plaintiff does not intend to offer such evidence or argument. However, if defendant or his counsel opens the door by testifying or otherwise mentioning the motion practice related to the video, then the plaintiff should be allowed to comment, respond, or offer evidence in rebuttal to the defendant's or counsel's testimony or comments or references in that regard.

**DEFENDANT'S MOTION *IN LIMINE* NO. 5 TO BAR UNDISCLOSED WITNESSES**

Each of the individuals who Plaintiff intends to call as a witness was disclosed throughout discovery. The witnesses' identities and the subject matter of their knowledge, were contained in documents produced by the City of Chicago therefore, was made known to defendant during the discovery process. In Plaintiff's initial rule 26(a) disclosure, counsel listed "Other Chicago police department personnel (identified in reports bearing #HW108051 and #HW 114498)." Wayne Gulliford, Patrick Hackett, and Jonathan Reckard, are all Chicago Police Department personnel listed in those reports. Moreover, an investigating detective Patrick Hackett was specifically, disclosed in Defendant's Joint Rule 26(a)(1) disclosures, Defendant Kevin Fry can hardly claim surprise by the calling of a witness he disclosed. Finally, these witnesses were disclosed in a letter defense counsel presented the above listed witnesses for

9

deposition. Exhibit 3 hereto, Aug. 7, 2014 letter. Additionally, attached hereto as Exhibit 4 is a supplemental Rule 26 disclosure statement from the plaintiff – identifying only those individuals who were disclosed as witnesses during the course of fact discovery in this case.

Indeed, the statements of Rosie Inwang, Randall Boykin, and Mitchell Coleman were all contained in the above referenced reports generated by the Department's investigation into the death of Cedrick Chatman. Video of the January 7, 2013 interviews of Randall Boykin and Mitchell Coleman by Detectives Hackett and Alfini were also produced by the City of Chicago during the course of fact discovery in this case. Defendant has not demonstrated that he has been harmed by the failure to formally disclose these three witnesses.

As for Pat Camden, much has been asserted during motion practice in this case about public statements – more accurately described as public misstatements – made by a Chicago police union spokesman, Pat Camden, about the events of January 7, 2013. Indeed, Mr. Camden was part and parcel of an effort by the Chicago Police Department to smear the name and reputation of Cedrick Chatman. . . with claims that Chatman pointed a dark object at the officers on the scene prior to his execution by Officer Fry. Plaintiff maintains that evidence of Camden's role in smearing the good name of her son is part and parcel of the Estate's damages claim in this case.

**DEFENDANT'S MOTION *IN LIMINE* NO. 6 TO BAR ANY EVIDENCE SUGGESTING THAT THE POLICE DID AN IMPROPER INVESTIGATION OF THE SHOOTING INCIDENT**

This motion should be denied, as defendant's request again sweeps too broadly. Defendant argues that whether there was an adequate investigation after the fact is irrelevant. However, this argument is unconvincing. Whether officers engaged in misconduct or falsified police reports after the shooting does have relevance in this case. Such evidence can go to, for

example, witness bias or motivation. *Galvan v. Norberg,* 2006 U.S. Dist. LEXIS 32386, at *2-3 (N.D. Ill. May 10, 2006). It may properly affect the weight the jury gives to police reports or officers' testimony. *Saunders v. City of Chicago*, 320 F. Supp. 2d 735, 740 (N.D. Ill. 2004). It may go to defendant's and other officers' state of mind.

Plaintiff's case theory is that defendant and other police officers engaged in a cover-up. She is entitled to present his theory to the jury. For example, both Officer Toth and Fry testified in their depositions that Cedrick Chatman did not point anything at the officers, and both officers testified that they did not tell any other Chicago police personnel that Cedrick Chatman pointed an object at the officers. Yet Officer Toth's Officer Battery Report "OBR" (which he claimed he did not prepare) states "small black object/pointed at R/O." Officer Toth testified that Deputy Chief Gulliford prepared the OBR, but Gulliford denies preparing Toth's OBR. Additionally, Deputy Chief Gulliford, the highest ranking Chicago Police Department employee on scene, told IPRA investigator Daniel Nuebeck, that there were no "relative civilian witnesses" to the shooting. Yet, the video in this case, clearly shows, various witnesses to the shooting, including but not limited to the Chicago Public School safe passage employee, Kevin Bell, and the occupant of the Black Jeep, Rosie Inwang, who approached the intersection from the south, and was attempting to make a right turn onto eastbound 75th Street, when Cedrick Chatman ran into her vehicle. Both civilian witnesses were still in the vicinity after the shooting. In fact, Rosie Inwang approached investigating detective Alfini and told him that her vehicle had been damaged by a male black who ran into her vehicle while she was approaching 75th Street from the south. These are just a few examples of how the post shooting investigation may be relevant to the practice of "getting the story straight" and lying on official police reports to cover for colleagues.

11

Defendant further argues that the public duty rule precludes plaintiff from asking a claim of inadequate investigation citing, *Zimmerman v. Village of Skokie, 183 Ill. 2d 30, 44 (1998).* It should be noted that in January, the Illinois Supreme court abolished the public duty rule in *Coleman v. East Joliet Fire Protection District*, 2016 IL 117952 Ill.

**DEFENDANT'S MOTION *IN LIMINE* NO. 7 TO BAR ANY EVIDENCE RELATING TO A *MONELL* OR A WILLFUL AND WANTON SUPERVISON CLAIM**

Again, Defendant has filed an overly broad motion *in limine* that is not specific with respect to the evidence that it is directed. See, e.g. *Gonzalez v. Olson*, 2015 U.S. Dist Lexis 76203 (N.D. Ill. June 12, 2015) (denying without prejudice defendants' motion *in limine* that did not specify what defendants sought to exclude in relation to evidence that City of Chicago improperly trains, disciplines, monitors, or controls police officers'). Plaintiff has no way of knowing if defendant seeks to bar all evidence related to Chicago Police Department policies, and regulations, as well as, officer training, discipline, or any other imaginable claim that could be included in a *Monell* claim. For this reason, defendant's motion should be denied. Plaintiff acknowledges the court's order bifurcating her willful and wanton claim against the City, and plaintiff does not intend to offer such evidence.

**DEFENDANT'S MOTION *IN LIMINE* NO. 8 TO BAR EVIDENCE OF INDEMNIFICATION**

The defendant seeks to bar any reference to the City of Chicago's indemnification of Kevin Fry. However, in this case, plaintiff is seeking both compensatory and punitive damages awards against Kevin Fry. If defendant or his counsel open the door by testifying, otherwise mentioning, or introduce evidence of Fry's claimed inability to pay damage awards, the plaintiff must be permitted to introduce into evidence that Officer Fry will be indemnified by the City of Chicago for any compensatory damages award. See *Christmas v. City of Chicago*, 691 F. Supp. 2d 811, 818-819 (N.D. Ill. 2010). *Galvan v. Norberg,* 2006 U.S. Dist. LEXIS 32386, at *7-8

12

(N.D. Ill. May 10, 2006) ("if defendants themselves inject the issue of their claimed inability or limited ability to pay an award, evidence of their right to indemnification by the City will become relevant.").

**DEFENDANT'S MOTION *IN LIMINE* NO. 9 TO BAR EVIDENCE OF PLAINTIFF'S OWN EMOTIONAL DAMAGES OR INDEPENDENT RELIEF**

Defendant's motions to bar plaintiff from claiming emotional damages or independent relief should be denied. The Wrongful Death Act, 740 ILCS 180/2, sets forth who may bring suit for wrongful death and for whose benefit such an action may be maintained. The Act provides: Every such action shall be brought by and in the names of the personal representatives of such deceased person, and, except as otherwise hereinafter provided, the amount recovered in every such action shall be for the exclusive benefit of the surviving spouse and next of kin of such deceased person . . . . 740 ILCS 180/2 (West 1998)

The Act also delineates how the proceeds of a wrongful death suit are to be apportioned among the eligible beneficiaries: The amount recovered in any such action shall be distributed by the court in which the cause is heard or, in the case of an agreed settlement, by the circuit court, to each of the surviving spouse and next of kin of such deceased person in the proportion, as determined by the court, that the percentage of dependency of each such person upon the deceased person bears to the sum of the percentages of dependency of all such persons upon the deceased person. 740 ILCS 180/2 (West 1998)

Next of kin under the Wrongful Death Act are "those blood relatives of decedent in existence at decedent's death who would take decedent's property if decedent had died intestate." *In re Estate of Finley,* 151 Ill. 2d 95, 101, 601 N.E.2d 699, 701 (1992). Courts must apply the Illinois Probate Act of 1975 to determine wrongful death beneficiaries. Here, the applicable law of intestate succession entitles Cedrick Chatman's mother, father, brothers and

13

sisters alive at the time of his death to share in his estate. The rules of descent and distribution provide:

> "(d) If there is no surviving spouse or descendant but a parent, brother, sister or descendant of a brother or sister of the decedent: the entire estate to the parents, brothers and sisters of the decedent in equal parts, allowing to the surviving parent if one is dead a double portion and to the descendants of a deceased brother or sister per stirpes the portion which the deceased brother or sister would have taken if living." 755 ILCS 5/2-1(d) (West 1998).

Thus under the wrongful death act, Linda Chatman is next of kin and has a right to recover damages for the wrongful death of her son. The damages sought by the Estate for the wrongful death of Cedrick Chatman are set forth in the jury instructions proffered by plaintiff at part of the final pretrial order submissions.

**DEFENDANT'S MOTION *IN LIMINE* NO. 10 TO BAR ANY ARGUMENT THAT THE POLICE HAVE A CODE OF SILENCE**

This motion should be denied, as once again Defendant's requests sweeps too broadly. Plaintiff should not be precluded from arguing that those officers testifying in this case are biased towards protecting themselves and each other, or that one would expect officers to remain silent if they witnessed the violation of Plaintiff's constitutional rights by fellow officers. Indeed, "[a] party's and a witness's common group membership is probative of bias * * *." *Townsend v. Benya,* 287 F. Supp. 2d 868, 876 (N.D. Ill. 2003). Thus, to the extent that Plaintiff focuses on the officers and incidents involved in this case, Plaintiff may explore the possibility that the defense witnesses in this case are biased because of loyalty to one another. See, *e.g., Saunders v. City of Chicago*, 320 F. Supp. 2d 735, 740 (N.D. Ill. 2004); *Galvan v. Norberg*, 2006 WL 1343680, at *3 (N.D. Ill. May 10, 2006) (denying motion in limine seeking to bar "code of silence" evidence since "evidence or argument of this type can go to the issue of the bias or motivation of witnesses"). "Proof of bias is almost always relevant because the jury, as finder of fact and weight of credibility, has historically been entitled to assess all evidence which might

14

bear on the accuracy and truth of a witness' testimony." *Cooper v. Daily,* 2012 WL 1748150, *8 (N.D. Ill. 2012) quoting *United States v. Abel,* 469 U.S. 45, 52 (1984). Such testimony regarding "code of silence" is therefore relevant to show bias and motive to falsify evidence, and should not be excluded at trial. Cross-examination about loyalty to other Defendants and police officers involved in this case also is proper as to possible witness bias. There may be additional situations in which it is proper for Plaintiff to introduce evidence of the conduct of police officers involved in this case, and that evidence may be admissible. Any objections Defendants may have to this sort of questioning will be made in the context of trial.

WHEREFORE, plaintiff requests this Court ruling on defendant's motions consistent with this response.

Respectfully Submitted,

/s/ Mark F. Smolens
Attorney for Plaintiff

BRIAN W. COFFMAN # 6285942
COFFMAN LAW OFFICES
2615 N. Sheffield  Suite #1
Chicago, IL 60614
773-348-1295
bcoffmanlaw@gmail.com

MARK F. SMOLENS #6190482
RICHARD R. MOTTWEILER #3123509
NICOLE L. BARKOWSKI #6295834
MOTTWEILER & SMOLENS, LLP
1627 Colonial Parkway - Suite 301
Inverness, Il 60067
773 - 580-4982
ryansmolensjones@hotmail.com

15