UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION

LINDA C. CHATMAN, as Special )
Administrator of the Estate )
of Cedrick Chatman, deceased, )
                                        )
            Plaintiff,                  )
                                        )
        vs.                             ) No. 13 C 5697
                                        )
CITY OF CHICAGO, et al.,                ) Chicago, Illinois
                                        ) May 12, 2016
            Defendants.                 ) 10:40 a.m.

TRANSCRIPT OF PROCEEDINGS - Pretrial Conference
BEFORE THE HONORABLE ROBERT W. GETTLEMAN

APPEARANCES:

For the Plaintiff:          LAW OFFICE OF MARK F. SMOLENS
                            BY:  MR. MARK F. SMOLENS
                            1627 Colonial Parkway, Suite 301
                            Inverness, Illinois 60067
                            773.580.4982

                            COFFMAN LAW OFFICES, P.C.
                            BY:  MR. BRIAN W. COFFMAN
                            2615 North Sheffield Avenue, Suite #1
                            Chicago, Illinois 60614
                            773.348.1295

                            LAW OFFICE OF RICHARD MOTTWEILER
                            BY:  MR. RICHARD R. MOTTWEILER
                            1627 Colonial Parkway
                            Inverness, Illinois 60067
                            312.259.0234

                            MS. NICOLE L. BARKOWSKI
                            1627 Colonial Parkway
                            Inverness, Illinois 60067
                            987.758.8591

Official Court Reporter:    NANCY L. BISTANY, CSR, RPR, FCRR
                            219 South Dearborn Street, Room 1706
                            Chicago, Illinois 60604
                            (312) 435-7626
                            *nancy_bistany@ilnd.uscourts.gov*

APPEARANCES:   (Continued)

For Defendant              HALE LAW LLC
Kevin Fry:                 BY:   MR. AVI T. KAMIONSKI
                                 MR. ANDREW M. HALE
                                 MR. SHNEUR Z. NATHAN
                           53 West Jackson Boulevard, Suite 330
                           Chicago, Illinois 60604
                           312.341.9656

Also Present:              MR. MICHAEL MOTTWEILER

(Proceedings heard in chambers on the record:)

THE COURT: All right. This is Chatman versus City, 13 C 5697.

Put your appearances on the record.

MR. KAMIONSKI: Avi Kamionski for Kevin Fry.

MR. HALE: Andrew Hale for Kevin Fry.

MR. NATHAN: Shneur Nathan also for Kevin Fry.

THE COURT REPORTER: I'm sorry, your name again, please?

MR. NATHAN: Shneur, S-h-n-e-u-r, last name, Nathan, N-a-t-h-a-n.

THE COURT: Off the record for a second.

(Discussion off the record.)

MR. SMOLENS: Mark Smolens for the plaintiff.

MR. COFFMAN: Brian Coffman, C-o-f-f-m-a-n, for the plaintiff.

MS. BARKOWSKI: Nicole Barkowski, B-a-r-k-o-w-s-k-i, for the plaintiff.

MR. R. MOTTWEILER: Rick Mottweiler for the plaintiff.

THE COURT: Is somebody else here?

MR. R. MOTTWEILER: Michael Mottweiler is a clerk with our firm.

THE COURT: Any relation?

MR. R. MOTTWEILER: Yes, he is, I'm proud to say.

THE COURT: Good. All right.

This is here for pretrial conference. I'm going to -- I have two things on my agenda today. First is to deal with the motions *in limine* and then to go over some of the jury instructions.

Let me start with the *Daubert* motion. I reviewed everything you've given me on this. And I'm going to grant it in part and deny it in part. The only thing that this -- that Mr. Kapelsohn is going to be able to testify as an expert is the relationship of the iPhone box to certain guns. I think that's something that the jury might not otherwise know about, and I think he's capable of testifying to that as a gun expert, which is what he is.

The other matters that the defendant wants to have him testify about are not going to be allowed. He's not a forensic pathologist. He has no expertise in bullet trajectory and bodies and that sort of thing.

His proffered testimony about the officers' training is factual based. It sounds to me like vouching more than anything else. The officers can certainly testify about how they're trained, what they saw, why they reacted as they did. I think that it's fair game for the officers to testify about that.

You don't need an expert to tell a jury that if somebody is pointing a gun at you, as a police officer you have

a right to defend yourself. I just think the rest of it is based on bogus science, if it's even science. It's probably not. But the only thing I think he can testify about as a gun expert is that the box is the shape and size, at least he says, of certain types of weapons that the jury might not be familiar with. So that's the limit of his testimony. That takes care of that.

And the other motions, let me just go through how we're going to rule on those. Starting with the plaintiff's motion to limit the juvenile record, the admission of the juvenile record -- they say the inadmissible juvenile record -- I'm going to grant it in part, deny it in part.

I think that the juvenile record is certainly relevant to damages here, and it can come in as to damages. But because it is so prejudicial to the case itself, painting this kid as a juvenile delinquent basically, which he may have been, would be very prejudicial to the underlying case on liability.

So I'm going to bifurcate this trial. I've never done it before, to be honest with you, in 21 years. I know that some of my colleagues used to do it all the time. I might have tried it once, and I didn't like it. But I think in this case, because we have some very prejudicial evidence about the decedent that is relevant to damages, it would be improper to let that in in the liability phase and tell the jury to ignore

it except for damages.  I think that would be really hard.  So I'm going to bifurcate the case.

So that will be the ruling on that one.

No. 2, about the taxpayers, that was granted by agreement.

No. 3, suggesting that he consumed alcohol or drugs in the past, again, that's relevant to -- the case law is very clear about it's relevant to damages but not to liability.  So that will be part of the damages case should there be a finding on liability.

No. 4, barring attempts to bolster credibility, that was granted by agreement.  And the defendant's condition I think is appropriate, that that might be revisited if the plaintiff seeks to introduce evidence of disciplinary matters and gets them in somehow.  They might be able to rebut that, but that probably won't happen.

The lottery argument is granted by agreement.  That's No. 5.

High crime neighborhood is granted by agreement.  That's No. 6.

No. 7, financial hardship is granted by agreement.  We'll get back to that in a second.

No. 8, the evidence related to the Dodge Charger is granted by agreement.

No. 9, to bar reference to the fact that some of

his -- that the decedent and some of his family were involved in gun violence, I'm granting that. I think those incidents are too attenuated and speculative. I don't know why people were shooting at these folks who might have not had anything to do with the decedent's conduct. It could have been random, and I don't want to get into -- it's ancillary, and I don't want to get into a mini trial about that.

To bar evidence related to the details of the evidence at 7602 South Jeffrey is granted in principle. The defendant is allowed to offer only evidence of what he knew -- and, of course, his witnesses can testify about this, too -- what he knew at the time of the shooting.

I think I have to reserve further ruling in connection with the plaintiff's damage case if there's a -- if the jury comes in on liability. But I think we all know the rules of this. The officers can testify or offer evidence about what they knew at the time of the shooting but not before. And there's some nuances to that as well, and I think we'll have to see what happens at trial.

The defendants' motions to bar mention that Chatman was not in possession of a gun, I'm denying that, because what he had and didn't have I think is relevant. And I'm concerned about the possibility that a juror could think, well, even if what he was holding was a box, maybe he did have a gun because the police officer thought he had a gun. So I think that

that's balancing it. It's a closer question, but I'm going to allow that in.

And also you stipulated in the pretrial order that he didn't have a weapon, so it's not really a contested issue.

Defendants' No. 2, to bar reference to other lawsuits, I'm granting that in principle, unless the defendant opens the door somehow with admissions to prior acts in his testimony, which I doubt that he will.

No. 3, to bar reference to other incidents of police misconduct, again, I'm granting that in principle. You know, I don't want to hear the word "Laquan McDonald" in this case. I don't think we're trying that case or any other case that might come up like the one that's on trial right now unless the door is opened somehow during the presentation of evidence somehow by -- in either party's case. We have to concentrate on the facts of this case, concentrate the jury on this case.

To bar -- No. 4, to bar reference to motion practice, that's granted by agreement.

To bar undisclosed witnesses, No. 5, that's granted in principle as well. Only those witnesses -- I just want to make this very clear to you. Only the witnesses who have personal knowledge of the matters and the facts leading up to this incident and whose names were disclosed will be allowed to testify in this case, which is really on the eve of trial.

I'll reserve the ruling with respect to the damages

phase should the jury find for liability for the plaintiff, because I just can't predict everything that's going to happen up to then. But as far as I'm concerned, everybody has to have been disclosed by now who actually had the personal knowledge. And I think we know who the people are, so I don't think there's any real secrets here.

To bar evidence that the police did an improper investigation, I'm granting that in part and denying that in part. Again, the plaintiffs -- I've been through this before, I think, with you. The plaintiffs are not allowed to introduce evidence about any allegations of an improper investigation by CPD or IPRA. We're not here to impeach IPRA. But any statements made by any witness that are inconsistent with their testimony, obviously, no matter when they're made, can be used for impeachment purposes. So if there were statements made to IPRA that you can impeach him on, go ahead and do it, but we're not trying IPRA in this case. I made that pretty plain.

To bar evidence relating to *Monell* or willful or wanton supervision, I'm granting that in principle unless, again, a defendant opens the door to that type of evidence.

And you've got to remember, any of these motions *in limine* are always provisional depending on what happens at trial. We can always revisit them, but I'm doing the best I can right now.

To bar evidence of indemnification, I think we know

the rules. I'm granting that in principle unless the defendant introduces evidence of his own personal financial condition, in which case we can get into that. I'll have to see.

To bar evidence of the plaintiff's emotional damages, I'm going to take -- we'll get into that in a minute. I'm going to take additional briefing on that, because we have done some research on the difference between the damages that are recoverable and for whom in the excessive force versus the wrongful death case. And there is a difference, and we have to deal with that in the jury instructions, so I'm going to ask you for some additional briefing on that.

No. 10 was to bar the code of silence. I'm denying that in principle, but I want you all to understand this. The plaintiff may certainly examine any of the police witnesses about their motivation, biases, and that sort of thing. You know, did you say what you did because you're a policeman, and you're protecting your colleague? That's fair game and, obviously, follow-up questions to that.

We're not -- we're not trying a so-called code of silence. If somebody were to mention that, if one of the defendants were to mention that in response to a question, I suppose you could open the door; but otherwise, I think I'll have to reserve on whether or not that's admissible at all. But I know what we're all talking about. It's been publicized, but I think we have to concentrate on the witnesses who are

testifying at this trial and their particular personal biases.

So that takes care of the motions *in limine* that I have at this point. And I think that given those rulings -- we'll get an order out today. Given those rulings, I think you should take another look at your witness list and your exhibit list and that sort of thing and try to agree on as much as you can about that.

Let me go through the jury instructions with you based on what I've got here. And then we're going to talk about this damage instruction, because that's an interesting issue. You can tell by the number of little yellow tabs that I have a lot of things. Most of them are fairly routine.

Thank you for numbering the pages. It's always a pleasure to have that.

So we'll do page No. 2. I'm going to refer to them as the page numbers, and this is the ones that were filed. It's document No. 213 filed on April 22. I think you guys did a nice job in putting these together, generally.

I don't ask questions of witnesses, so take that one out. If I do, we'll put it back in. But that will be a first. I guess there's a first time for everything, but I don't think it's going to happen.

Page 4, I don't know whether there are going to be stipulations. Are there going to be stipulations?

MR. SMOLENS: There are in the pretrial order.

THE COURT: Yes, in the pretrial order, I suppose. All right. So we'll leave that in. You're allowed to read those in if you want.

I don't know about taking judicial notice.

MR. SMOLENS: Yeah, that's why we have it in brackets just in case.

THE COURT: Let's take it out for now, the judicial notice. If we need it, we can put it back in. I don't think we're going to have any judicial notice issues here.

Page 5, I didn't see any designated depositions. So we'll take that out.

Again, this is all provisional based on what happens. We can revisit any of these things.

I originally had a question about page 9, limited purpose, but I have a feeling there will be some limited purpose evidence, particularly when the police witnesses testify about what they heard on the radio and that sort of thing. That will come in not for the truth but for their own state of mind and to explain their actions. So that's probably -- leave that in for now.

Page 13, there's bracketed language there. I usually just leave that in. I think it's easier to just leave it in now, the "or acted in the manner," because it's in the disjunctive. So it will make it easier for us later on.

Page 17, opinion witnesses, I think if we just say,

"You have heard a witness," there probably will be -- well, if there's a liability finding, there will be more than one witness, obviously, but expert witness. But since I'm allowing the expert to come in about the guns, there will be at least one. So let's just leave it, "You have heard a witness."

MR. KAMIONSKI: We're going to have another witness on the liabilities side, who is a medical doctor.

THE COURT: Okay. All right. So then maybe we should leave it. If there's going to be two for sure --

MR. KAMIONSKI: There's going to for sure be two in the liability phase.

THE COURT: Let's leave it then. "Witnesses," that's fine. And there was no objection to that.

All right. Demonstratives, are we going to have demonstratives? I think we'll have the gun. I mean, if he wants to show --

MR. KAMIONSKI: The box.

THE COURT: -- a gun -- well, the box is real evidence. I mean, that's what he had in his hand.

MR. KAMIONSKI: Right.

THE COURT: That's not really a demonstrative.

MR. KAMIONSKI: We do have some demonstrative, like videos and stills that we're going to be using.

THE COURT: What are they?

MR. KAMIONSKI: Like displays. We have, like,

showing the trajectory of the bullet into the hand based upon the, you know, forensic pathologist we disclosed. He's going to talk about the entrance wound, and we have a diagram that shows that.

THE COURT: Okay. All right. Then that's fine. So there will be a couple of those?

MR. KAMIONSKI: Yes.

THE COURT: So just take out the brackets then.

Trying to get as much homework done as we can --

MR. KAMIONSKI: Always good.

THE COURT: -- so we don't have to revisit these and waste time.

Page 19, are there going to be -- is there going to be any stipulation about a nonappearing witness that you know about?

MR. KAMIONSKI: I don't know of any right now.

MR. SMOLENS: That's why it says, to be offered only if necessary depending upon developments at trial.

THE COURT: Well, let's take it out for now. If that happens, we'll put it back in.

No. 20 is redundant. We already had the stipulation for the other one, so we don't need it again.

All right. Page 22, those are -- those should be last. They're out of order here. They might be out of order on the Court's website, too. I don't really know.

But page -- from page 22 to 24, we will give you our final two instructions that you can put in there before you leave today. Mine is the same as the Seventh Circuit's except I add that we can't give them transcripts, which is sometimes what they always ask for, so we just tell them up-front we can't give them transcripts.

Okay. The excessive force, I am going to use the standard Seventh Circuit 7.09 without the laundry list of things that can be considered, because almost all of those, if not all of those, are really for cases where the use of force is less than fatal. And I don't think we need them here.

So I think we're going to use the defendants' instruction No. 1 on page 29.

All right. The state law claim is -- I don't think it is duplicative. At first I thought it was. In fact, I had asked Mr. Smolens at one point to consider dropping it because I thought it was. But as the research we've done -- and this is where we have to -- we have to redo the damage instructions, too -- I think there should be two sets of damage instructions; one for the excessive force case and one for the wrongful death case.

I want to refer you to an Appellate Court case that we found I think that really is very clear on this issue. It's called *Magna Trust versus Illinois Central*. It's 313 Ill. App. 3d, 375. It's a 2000 case. And it goes into the purpose of

the Wrongful Death Act. And this is, frankly, something we don't deal with too often.

And there's also some IPI instructions on this that I think you could -- you should actually use.

But under the Wrongful Death Act, the administrator -- and this refers to your motion *in limine* -- the administrator sues on behalf of the next of kin of the decedent and for losses due -- it says here for losses sustained due to the death.

And in this case, it was a surviving spouse, but here we have siblings and a mother. And you have to name those people in the actual instruction. I'll refer you to the IPI instruction in a moment.

But it not only encompasses a value of life generally, but also the value that the decedent had to others and, as it says here, as part of a functioning social and economic unit. It includes value of society, companionship, and conjugal relations that the decedent provided to the surviving spouse. And I guess that would also -- not conjugal, but it would also include emotional damages to the mother and the sisters. I don't know what kind of evidence you have about that.

And so the mother isn't suing just for the economic value, but she's suing on behalf of what -- the family members that were left behind. And I'm going to refer you and leave it

up to you to craft this yourself because -- it's IPI 31.03, .07, and .09. You should refer to those in putting that together.

And so I think you have to have damages if they find for excessive force and then damages if they find for wrongful death, which of course is a different standard. One is intentional, and one is willful and wanton. So I think you have to break that up in your -- I'm not going to draft that for you. I want you to try to do it yourselves.

And that would take care of the damages instructions. I know you tried to do it, and I like doing it in one instruction if we could, but I think you're going to have to break them up.

Now, on punitive -- I don't want to say any more about that. I want you guys to take the next crack at that, and we'll deal with that as soon as we can when I get back.

On the punitive damages, I think -- is Mr. Fry going to submit evidence of his financial condition, personal financial condition?

MR. KAMIONSKI: I think that if we -- if we're going into a -- as -- as it's going to play out, if we lose, okay, and we're having a damages trial, oh, yes, he's going to -- he's going to -- he's going to -- he's going to submit.

And we understand that if he does offer and say I'm poor that the plaintiff gets to say the city is paying the

compensatory. We know the -- we know how the game -- we know how it works. But given this type of circumstances, we could do that.

One thing we've done in other cases before is bifurcating out the punitive damages phase of the -- of the -- of the thing as well. So you could have a compense -- you have a damages trial after -- if we lose, and then there's a decision on the damages. And then you could decide -- then the jury could decide whether or not they also want to award punitives after that -- on top of that.

THE COURT: You mean trifurcate the trial?

MR. KAMIONSKI: Kind of trifurcate it.

THE COURT: No, no.

MR. HALE: Come on, Judge. Let's do it. Be the first.

THE COURT: No, let's do it at one time.

MR. KAMIONSKI: Okay. So --

THE COURT: We just include that in the instruction then. So for the punitive damage instruction, I think you include his financial condition.

MR. KAMIONSKI: Can I ask a question? I know you don't want to go back and talk about the -- I'm not here to argue about the damages instruction on the -- on the wrongful death, but I'm assuming whatever instructions get crafted, the instruction that gets -- is there going to be a wrongful death

instruction submitted in the liability phase to the jury that they have to find that there was -- not only was there excessive force but also a wrongful death?

THE COURT: Yes.

MR. KAMIONSKI: Okay. And is any of the language in the wrongful death instruction going to take into account the emotional state of the -- of the person bringing the wrongful death action?

THE COURT: No, I don't see why it would.

MR. KAMIONSKI: Okay. So they --

THE COURT: The wrongful death -- you know, the excessive force standard, we all know what that is.

MR. KAMIONSKI: Right.

THE COURT: The wrongful death standard has the willful and wanton. So in other words, they could find no excessive force because it wasn't intentional, but it was willful and wanton. I don't think that would be inconsistent. I think it would be unusual.

MR. KAMIONSKI: Right.

THE COURT: If they find one, they're probably going to find both, but I don't know.

MR. KAMIONSKI: But they --

THE COURT: There are different standards. I mean, we've been looking into this, and we usually don't see the wrongful -- most times the plaintiffs drop the wrongful death

count.

And I could see where the jury could be a little confused about it, too, but I think that that's the law on this. And there's a slightly lesser standard, and I think they are able to get in more damages evidence as a result. So I could see why they want to keep it.

So -- but, no, her state of mind, her loss and all the rest of it, that doesn't come in except in the damages phase. So in my view, the way this is going to happen, I think the liability case here is going to be a lot quicker than the damages case.

MR. KAMIONSKI: In theory, I mean, the way I see it, there's nothing for the plaintiff's side to offer from any of their witnesses to testify other than maybe to establish that this was their child.

THE COURT: Well, that's stipulated.

MR. KAMIONSKI: That's stipulated. So they don't have to testify at all.

There's nothing relevant that comes out of their witnesses, because they didn't see what happened. It should be -- only be Fry and Toth and anybody who was on scene. Anybody else afterwards that didn't see what happened -- and the video and the experts, but other than that, that's the liability case, it sounds like.

THE COURT: I think I said that the first time we

were together. I said plaintiff's case should be about as long as that video.

MR. KAMIONSKI: Right. Right.

THE COURT: And you're stipulating to the authenticity of the video?

MR. KAMIONSKI: Yes, yes.

THE COURT: And you've got some stills and --

MR. KAMIONSKI: Correct. Right. Right.

THE COURT: -- and that sort of thing.

So I think you should try to streamline this as much as you can, because I think your whole case comes in on that video. And then, of course, the officers will testify, you know, why they did what they did and what was --

MR. KAMIONSKI: Right.

THE COURT: -- what was there.

But, yes, you're right. I don't see any witnesses, other than the people who were there, to the liability.

MR. SMOLENS: Do the -- are we going to tell the jury that we're bifurcating?

THE COURT: No.

MR. SMOLENS: So then --

THE COURT: There's one reason I don't -- one reason I never like to bifurcate is because, you know, the jury should not be told --

MR. KAMIONSKI: Right.

THE COURT: -- that. You don't want them to be told that. Because if they want to get out of town early, they're going to say no liability.

MR. SMOLENS: But then they're going to wonder why Linda Chatman doesn't testify about her son, why --

THE COURT: Because she wasn't there. We can tell -- the instructions are going to be very clear. You are to decide the liability. There's not going to be any damages instructions at all.

So we could take out that one instruction about, you know, should you find --

MR. KAMIONSKI: Right.

THE COURT: -- should you not find damages. I guess we should take that out, too. Should you not find liability, you don't have to get to damages.

MR. KAMIONSKI: And just do --

THE COURT: I will do this. I will do a little bit of homework about how you actually set the jury up just for a bifurcated trial. I haven't done it before, but they used to do it all the time.

But I know one thing. You never tell the jury -- you know, you don't want them to do that. You know, should you find for the defendant, you don't have to come back.

MR. SMOLENS: Well, the only time that I've tried a bifurcated case, they did exactly that.

THE COURT: Would you want that?

MR. SMOLENS: I don't want the jury wondering why Linda Chatman hasn't hit the stand. I want to be able to tell them: Once you determine liability, you're going to hear from the Chatman family about the damages that the estate has suffered. But the first thing that you folks have to do is decide liability against Officer Fry.

THE COURT: If you want me to do that, I'll do it.

MR. SMOLENS: Okay.

MR. HALE: Well, I'm not sure --

MR. KAMIONSKI: Yeah, I'm not sure.

MR. HALE: In fact, I don't think that's proper, Judge. I mean, we would object to that, because in the bifurcation, the ones we've done, it's you're not told.

THE COURT: I know, but usually that's because the plaintiff doesn't want it, because --

MR. R. MOTTWEILER: That's exactly what they do in a death penalty case.

MR. HALE: It's just not relevant. You know, if the case is about liability, that's what the case is about. So they shouldn't be talking about why you're not hearing about irrelevant witnesses. They're irrelevant.

THE COURT: But the --

MR. SMOLENS: But then they're going to be mad at us because they have to stay, and now you're going to be here for

three more days?

MR. KAMIONSKI: Well, it's not going to be three days, though.

THE COURT: It doesn't matter. It doesn't matter whether it's a day or three days. That's one reason I never like to bifurcate, but here I'm doing that because I think the damages evidence is very prejudicial to the plaintiff's liability case. You agree with that?

MR. SMOLENS: I do.

THE COURT: So I'm happy to tell them that the first phase of this trial will be to determine liability only.

MR. SMOLENS: Okay.

THE COURT: And we'll put that in the statement. We could do that as we start the trial after we pick the jury and if that's what you want. I don't see -- it doesn't hurt the defense at all. If anything, it incentivizes the jury to think, well, you know, that's one way out.

But, you know, I give juries a lot more credit than that, to be honest with you, and I think we'll be able to do that. So I will definitely do that, and we can talk about that next time we see each other.

Have I gone through how we select a jury?

MR. SMOLENS: No.

THE COURT: I know you've tried a case with me, right?

MR. KAMIONSKI: Right.

THE COURT: So I'll do it very quickly. It's on my website.

We will have a certain number of people in the panel, probably in this case around 25. Usually I do around 18, but because of everything going on, I think we'll have a few more just in case.

I go through everybody in the panel. We call them alphabetically. We do it in groups of 14, and we'll pick 8 jurors ultimately. They all deliberate. There's no alternates, as you know.

And we're going to give them a list of voir dire questions. I'm going to give you the list in a moment that we're going to ask them. I go through them with the panel. I ask each juror to stand and answer the questions. I follow up if I think there's a need to follow up. If the juror starts to say something, which may actually happen in this case, you know, I'll tell them not to say anything. If there's something that they don't want to testify about or to explain in front of everybody, I tell them we'll talk to them at sidebar.

And we go through -- we go through the entire panel that way. And then we go -- after each group of 14, we go to sidebar, and then we can call anybody up that I want to follow up with or you want to follow up with. You can then ask the potential jurors any questions you might wish to ask. Be

professional about how you do it, obviously, or I can ask -- if you want me to ask a question, I can do that. "You know, So-and-So said that their uncle was a police officer. Can you ask the juror where the uncle was a police officer?" Something like that.

You can move for cause at any time but not in front of the juror. Wait until they walk away. We call them up one at a time. I'm usually ahead of you on those things, but I may reserve until everybody is done.

And then we go through the entire panel. We take off everybody who has been struck for cause. You're each entitled to three strikes, but I try to give you as many extra strikes as I can, depending on how many people we have left.

So let's say we have 25 in the venire, and we have 20 left. We want 8, so that would be 12. I'd give you each 6 strikes. So you're basically picking the jury. There's not going to be anybody left over.

The way we pick those 6 is we -- I have a scrambled list. It's a computer-scrambled list. We used to shuffle the cards, but we don't have cards anymore. So we just -- we strike -- we take everybody's name off the scrambled list who has been struck for cause or on peremptory, and then the remaining six people or the first six people, if there's a common strike, will be the jury.

THE LAW CLERK: Eight.

THE COURT: Or the eight people. I'm sorry. Eight people.

So that's how we do it. It goes pretty quickly. I think even in a case like this, it will go pretty quickly. So if we start in the morning around 10:00, by the time everybody gets up, I give them some preliminary instructions, which is fairly brief, you know, give them a statement of the case.

We also give -- I want an alphabetical list of witnesses from you next time I see you. Not by who is calling them or anybody else. I just give the jury or the panel the voir dire questions and the alphabetical list as they walk in the door so that they can look at it. Instead of reading a bunch of names out that usually nobody is paying attention to anyway, I ask them to look at the list, and if anybody knows anybody on the list, to let us know when it's their turn.

And so we usually pick the jury before the lunch hour. We've even done it quicker than that sometimes, and we start right away.

I don't want to waste a lot of time during this trial. I discourage sidebars. That's why we do all this homework in advance, so everybody knows what we're going to do as much as we can. And that's it.

I have us beginning on the 20th, so that's the first day of summer, according to my calendar, let's hope. I have that entire week. And if we need the Monday following, which I

hope we don't, I have that open.  The 28th, I'm having some surgery, so we have to finish by then, but everybody tells me that we should be able to do that.

MR. SMOLENS:  No problem.

THE COURT:  Yes.  I'll hold you to that.

So good luck, everybody.  Let's do this.  Let's get a new set of jury instructions from you.  I'm going to be away for a couple weeks, so let's get them to me by June 1st, and let's come back on June 8th, say 10:30.

MR. HALE:  Judge, would June 7th be possible?

THE COURT:  I have a major fairness hearing that day. It could go all day.  I'm sorry.  I could do it June 9th.

MR. HALE:  Oh, you know, I'm sorry, Judge.  I had a brain cramp here.

I actually -- I have a state court trial that starts June 8th.  Is it possible to --

THE COURT:  You've got a lot of friends here.

MR. HALE:  Yeah, that's true.

THE COURT:  We're really -- I think we've done the majority of everything we have.

MR. HALE:  Yeah, yeah.

THE COURT:  I'd like to keep that, because if we have any more work to do --

MR. HALE:  Okay.  I'll have somebody else -- just so you know, I won't be here.

THE COURT: Okay.

MR. HALE: Two of the three won't be here, so we'll have somebody here for that.

THE COURT: All right.

MR. SMOLENS: What time do you want us, Judge?

THE COURT: 10:30.

MR. SMOLENS: 10:30.

THE COURT: And we'll get everything else wrapped up as much as we can by then. I think we have everything else we need at this point.

So I appreciate the work you guys have put into it. We'll give you the voir dire.

MR. HALE: What's the technology in your courtroom?

THE COURT: You're asking the wrong person. I can't even use my iPhone. So there are technology people. Nancy will help you out.

MR. HALE: Okay.

THE COURT: We definitely want to make sure that's all set up so everybody knows what we're doing.

If there's any particular problems with the voir dire questions I just gave you, which are pretty much our standard voir dire -- a lot of this stuff that you've suggested, we will cover in the follow-up and in the questioning of the jurors. I just don't want to suggest to them anything that we don't have to. But we can talk about that when we see each other on the

8th as well.

Okay, folks.  I think that takes care of everything on the record.

MR. SMOLENS:  Thank you, Judge.

MR. KAMIONSKI:  Thank you, Judge.

MR. HALE:  Thank you, Judge.

THE COURT:  Off the record.

(Proceedings concluded.)

C E R T I F I C A T E

I, Nancy L. Bistany, do hereby certify that the foregoing is a complete, true, and accurate transcript of the proceedings had in the above-entitled case before the HONORABLE ROBERT W. GETTLEMAN, one of the Judges of said Court, at Chicago, Illinois, on May 12, 2016.


/s/ Nancy L. Bistany, CSR, RPR, FCRR          May 18, 2016

    Official Court Reporter                        Date
    United States District Court
    Northern District of Illinois
    Eastern Division